Docket No. 99804.

IN THE

SUPREME COURT

OF

THE STATE OF ILLINOIS

---

THE CITY OF CHICAGO, Appellee, v. POOH BAH
ENTERPRISES, INC., *et al.*, Appellants.

*Opinion filed October 5, 2006.*

JUSTICE KARMEIER delivered the judgment of the court, with
opinion.

Chief Justice Thomas and Justices Fitzgerald, Kilbride, and
Garman concurred in the judgment and opinion.

Justice Freeman dissented upon denial of rehearing, with opinion.

Justice Burke took no part in the decision.

**OPINION**

Section 4–60–140(d) of the Municipal Code of Chicago prohibits
establishments licensed to serve alcoholic beverages from permitting
any employee, entertainer or patron to engage in "any live act,
demonstration, dance or exhibition *** which exposes to public view
*** [h]is or her genitals, pubic hair, buttocks *** or [a]ny portion of
the female breast at or below the areola thereof." The issue we are
asked to resolve today is whether this ordinance violates the first and
fourteenth amendments to the United States Constitution (U.S. Const,
amends. I, XIV) and article I, section 4, of the Illinois Constitution of

1970 (Ill. Const. 1970, art. I, §4). The circuit court of Cook County found that it does. The appellate court concluded that it does not. Nos. 1–01–0592, 1–01–1932 cons. (unpublished order under Supreme Court Rule 23). For the reasons that follow, we affirm the judgment of the appellate court.

The events which gave rise to this appeal began in 1993, when the Liquor Control Commission of the City of Chicago initiated administrative proceedings against Pooh Bah Enterprises, Inc. (Pooh Bah), to revoke various municipal licenses which had been issued to the company, including its municipal retail liquor license. The challenged licenses had been issued to the company in connection with its operation of a so-called "gentlemen's club" located at 1531 North Kingsbury Street in the City of Chicago.[1] The basis for the revocation was that the company, by and through its agents, had permitted various female dancers at the club to expose their buttocks or portions of their breasts at or below the areola to public view in violation of section 4–60–140(d) of the Chicago Municipal Code.

The record shows that Pooh Bah was originally owned by an individual named Jim Levin. Under Levin's ownership, Pooh Bah operated the club as the "1531 Club." When Levin began experiencing financial problems, Perry Mandera, owner and president of a Chicago-area-based shipping company known as The Custom Companies, lent him $300,000 in exchange for a security interest in 50% of Pooh Bah's stock. Mandera subsequently lent Levin an additional $500,000 to finance improvements to the club undertaken in connection with its becoming a franchisee of a chain of "strip" clubs operated by Michael J. Peter Club Management, Inc., under the name "Thee Dollhouse."

Prior to the switch to the Thee Dollhouse format, no nude or seminude dancing was performed at the club. Strippers did not appear until the club became affiliated with the Michael J. Peter organization. Unfortunately for Levin, the introduction of strippers did not bring financial solvency, and he was unable to repay Mandera the money he

---

[1]According to testimony presented in the circuit court, the term "gentlemen's club" denotes a commercial establishment where, for a fee, patrons can watch live dancing by nude or seminude women.

owed. Mandera ultimately took over full ownership of Pooh Bah through an entity he owned called Ace Entertainment.

According to his testimony, Mandera, through Ace Entertainment, became the sole owner of Pooh Bah and thus the strip club in the summer of 1993. After taking over, Mandera terminated the club's connection with the Michael J. Peter organization. In place of that company, Mandera, through Pooh Bah, entered into management and licensing agreements with Frederick John "Rick" Rizzolo, owner of a Las Vegas strip club known as "The Crazy Horse Too." Rizzolo became active in the management of Pooh Bah's club in 1995, while the license revocation proceedings were still pending.[2] For his services, Rizzolo was paid $20,000 per month, plus travel expenses.

Under Rizzolo's regime, the club dropped the name "Thee Dollhouse" and began operating under the same name as Rizzolo's club in Las Vegas, "The Crazy Horse Too." Mandera explained that he affiliated his club with Rizzolo because, when he came across The Crazy Horse Too in Las Vegas, "[he] liked what they did." He was

---

[2]Mandera required management assistance because he had no experience running strip clubs. Interestingly, Thomas Bridges, the person Mandera hired to be the club's general manager when Rizzolo entered the scene, had no such experience either. Prior to going to work for Mandera, Bridges had been a detective with the Chicago police department. Joe Pascente, one of the club's assistant managers, had also been associated with the police department. He was a probationary officer, but was fired for failing to disclose that he was the subject of an FBI investigation into insurance fraud involving his father, Fred Pascente. That investigation ultimately led to Fred's conviction on federal mail fraud charges. As with Bridges, Fred had been a Chicago police detective. Fred Pascente is now listed in the Nevada Gaming Commission and State Gaming Control Board's "Black Book" of excluded persons based on the mail fraud conviction and on his connection to organized crime in the Chicago area. See http://gaming.nv.gov/loep_pascente.htm. According to Joe, Fred was employed at the club when he began there in 1995 and remained working at the club up until the middle of 1999. Fred is the person who originally introduced Joe to Mandera. Joe described Mandera as a family friend and testified that before taking the job at the club, he worked for Mandera's shipping company.

impressed by the club's success and its desire to expand into other cities. According to Mandera, Rizzolo was willing to give him a far better financial arrangement than the one Pooh Bah had with the Michael J. Peter organization. Being affiliated with Rizzolo also provided Pooh Bah with access to the same pool of dancers Rizzolo used. In addition, Mandera testified that Rizzolo "seemed like a very nice person and operated a nice, up-scale operation ***."[3]

The club operated under the name The Crazy Horse Too until 2003. According to the briefs and records of the Illinois Secretary of State, the establishment now does business under the name "VIP's" or "VIP's, A Gentlemen's Club." Absent any indication from the parties to the contrary, we assume that its ownership and operations remain unchanged.

At the time the license revocation proceedings against Pooh Bah commenced and throughout the period relevant to this litigation, its club at 1531 North Kingsbury Street has provided something that other licensed establishments selling liquor by the drink in Chicago do not: seminude dancers. Entertainment venues featuring nude and seminude female dancers operate within the City's limits in compliance with municipal ordinances. None of them, however, has a liquor

---

[3]Shortly after this case was argued in our court, Rizzolo pleaded guilty in the United States District Court for the District of Nevada to a felony charge of conspiring to defraud the United States of taxes in connection with operation of his Las Vegas The Crazy Horse Too club. See *United States of America v. Rizzolo*, No. 2:06–CR–188–PMP–PAL, Plea Memorandum (June 1, 2006). At the same time, The Power Company, Inc., which is the parent company of the Las Vegas club, pleaded guilty to federal charges of "Conspiracy to Participate in an Enterprise Through a Pattern of Racketeering." See *United States of America v. The Power Company, Inc.*, No. 2:06–CR–186–PMP–PAL, Plea Memorandum (June 1, 2006). Proceedings in federal district court are a matter of which the courts of this state may take judicial notice. See, *e.g.*, *Pfaff v. Chrysler Corp.*, 155 Ill. 2d 35, 71 (1992). As part of the federal plea agreements, the club must be sold, and Rizzolo is barred from owning, operating, or having any involvement with any strip clubs or similar businesses involved in pornography or erotic entertainment or media in the United States and its territories for the remainder of his life.

license. Throughout all of Chicago, Pooh Bah's club is the only commercial establishment where the sale of liquor by the drink and dancing by seminude women are combined.

The mix of alcohol sales and nude or seminude dancing was not always so rare. Roger G. O'Brien, a veteran Chicago police officer who has worked in the Department's 18th District vice unit since 1979, testified that the City's Rush Street entertainment district was once home to 12 or 13 strip clubs, all of which served alcohol. During that time, prostitution in and around the clubs was pervasive. According to O'Brien, in the late 1970s and mid-1980s, there were prostitutes on every corner in the Rush Street area, and inside the clubs, waitresses and dancers frequently solicited customers for sex. Antiprostitution campaigns waged by the City during the 1980s ultimately resulted in the closure of all these establishments. O'Brien estimated that when the strip clubs serving alcohol were shut down, the number of prostitution arrests in the area declined by 80%.

Pooh Bah's club is not located in Chicago's Rush Street entertainment area and is not related to any of the City's 1970- and 1980-era strip clubs. The type of entertainment presented at Pooh Bah's club would, however, probably be familiar to patrons of those now-defunct establishments. After paying an admission charge, $15 in the year 2000, customers of the club enter a room containing a bar, an elevated stage area, and tables and chairs.[4] Female performers take turns going on stage, where they remove their clothing while dancing to prerecorded background music. For the most part, the performers called to testify in this case had not received any formal dance training. One described taking dance lessons when she was a child. Another indicated that while she had never been taught dance steps, she had "either choreographed or hired choreographers" to assist her in her performance.

---

[4]As the club was configured when the last hearing in the case was held, a special "V.I.P." room was located in an elevated are adjacent to the main room. The "V.I.P." room afforded patrons an additional measure of privacy while still permitting them to view the rest of the club. Admission to the room required payment of an additional fee.

Over the course of an evening, more than 20 women may perform on stage. During those performances, waitresses take drink orders from patrons and serve them at their tables. When an entertainer has finished on stage, she will circulate through the club and mingle with the customers. Her objective in doing this is twofold. First, she is expected to earn money for the club by encouraging patrons to buy premium-priced drinks for themselves and for her. Alcohol sales are a major source of the club's income, which is substantial. According to testimony given by Mandera in 2000, the club's gross annual revenue was $7 million. By comparison, strip clubs in Chicago that did not serve alcohol had annual revenues of only one or two million dollars.

A performer's second objective when circulating through the club is to earn money for herself through tips.[5] Dancers receive tips for providing two basic services: (1) sitting and talking with customers[6] and (2) doing table dances. A table dance is simply a brief striptease which a dancer performs for a customer at the customer's table. An additional fee is charged for this service. At Pooh Bah's club, the basic charge for a table dance is $20, but dancers reported receiving as much as $100.

---

[5]Performers were also occasionally tipped while performing on stage. When these proceedings began, tips were the sole source of compensation for most of the club's performers, who actually paid a fee to the club for the opportunity to perform there. The current compensation scheme, which involves a corporate intermediary as the women's nominal employer, appears to include some payments to the dancers in addition to sums earned as tips. The arrangement is a financially rewarding one for the performers. According to Mandera, the average dancer at the club was making "six figures a year" by the year 2000. Mandera reported his own take from the club to be $75,000 per month.

[6]According to Crazy Horse Too performer Tyra M. Andrews, a/k/a "Rio," topics of conversation range from the weather to "someone's, you know, intricate sexual fantasies."

The dances performed on stage and at customers' tables are intended to be erotic.[7] Performers typically move in a sexually suggestive fashion, often enhancing the effect by rubbing their breasts and pubic areas. Club policy specifies that dancers are to stay at least one foot away from customers during table dances, but evidence in the record suggests that this restriction is routinely ignored. The same is true of a club policy forbidding dancers to have physical contact with customers. The record shows that performers sometimes do deliberately touch customers during table dances. One report included earlobe nibbling. Dancer Tracey Lynn Sula admitted kissing customers on the cheek.

During both the on-stage performances and the table dances, performers become largely, although not totally, nude. By the conclusion of a strip tease, whether on stage or at a customer's table, the only item of clothing a dancer will still have on is a thong, sometimes referred to as a "T-bar." That garment consists of a narrow waistband to which is attached a panel of cloth intended to cover the woman's pubic area. A strip of material runs from the front panel, between the woman's legs, up through the cleft of her buttocks, then attaches to the waistband at the back. It is similar to a traditional G-string except that the cloth strip running between the woman's buttocks is wider. When a performer wears a thong, her anus is concealed. As with a G-string, however, her buttocks are left completely exposed.

Although performers at Pooh Bah's club remove all of their clothing but their thongs when they dance, they also apply flesh-toned makeup and latex to their nipples and areolas. The makeup and latex do not conceal the contours of the nipple area. They merely obscure the naturally darker color of that portion of the women's breasts.

---

[7]The sexually stimulating effect of the performances is illustrated by an event at the club which took place on May 17, 2000, shortly before the final evidentiary hearing in the case. According to Mandera, police had to be summoned when a customer was moved to "expose[ ] his erect penis and was stroking it in full of other patrons and the entertainers." Mandera, who was not physically present at the club when this episode took place, attributed it to the customer's injudicious use of the antidepressant medication Prozac. Alcohol was also implicated.

Evidence was presented that the dancers are also required by club policy and practice to extend the makeup and latex covering to a triangular area extending below the areola in the area in frontal portion of the breast. Whether any female performers at Pooh Bah's club ever actually did that is open to question. It is clear, however, that the entire sides of the dancers' breasts remained fully exposed with no latex or makeup coating. From photographs and video exhibits contained in the record, the dancers' breasts appear nude. But for the change in color of the nipples and areolas, one could not tell that the dancers' breasts had been covered in any way. Testimony from investigating police officers indicated that, in person, one could sometimes see through the makeup and latex and discern the difference in coloration between a dancer's areolas and the fleshy portion of her breasts.

While the name of Pooh Bah's club has changed over the years, the way dancers have appeared when interacting with customers has remained constant. The combination of "T-bars" and latex-covered nipples and areolas has been a hallmark of the club since it first adopted the "gentlemen's club" format in 1993. As we have previously indicated, and as we shall discuss again later, Chicago municipal ordinances do not prohibit women from dancing for customers in that state of undress. Throughout the period at issue here, clubs have been permitted to operate in the City featuring dancers who wear even less. Indeed, there are establishments where dancers perform in a state of complete nudity. What triggered this litigation is Pooh Bah's decision to present dancers in "T-bars" and latex makeup while continuing to serve alcoholic beverages to its patrons.

Pooh Bah's combination of nude or seminude dancing and liquor sales was opposed by municipal authorities as soon as the club attempted it. Pooh Bah introduced seminude dancing in February of 1993. City police were on the premises conducting investigations within two weeks. By the following month, the Liquor Control Commission of the City of Chicago had initiated administrative proceedings against Pooh Bah to revoke various municipal licenses which had been issued to the company, including its municipal retail liquor license. The basis for the revocation, as indicated at the outset of this opinion, was that the company, by and through its agents, had

violated section 4–60–140(d) of the Chicago Municipal Code, which prohibits establishments licensed to serve alcoholic beverages from permitting any employee, entertainer or patron to engage in "any live act, demonstration, dance or exhibition *** which exposes to public view *** [h]is or her genitals, pubic hair, buttocks *** or [a]ny portion of the female breast at or below the areola thereof." For purposes of the ordinance, the foregoing body parts are considered to be exposed to public view if they are "uncovered or [are] less than completely and opaquely covered." Chicago Municipal Code §4–60–140(d) (2006).

Pooh Bah attempted to block the license revocation by filing a suit for declaratory and injunctive relief in the circuit court of Cook County. The circuit court denied Pooh Bah's request for a temporary restraining order. The Local Liquor Commissioner of the City of Chicago subsequently entered an order, following the requisite notice and a hearing, which revoked the City of Chicago retail liquor license and all other city licenses issued to Pooh Bah for its strip club at 1531 North Kingsbury Street based on its determination that the company had, in fact, violated section 4–60–140(d) of the Municipal Code.

Pooh Bah appealed the revocation of its liquor licence to the City of Chicago's liquor appeal commission pursuant to sections 7–5 and 7–9 of the Liquor Control Act of 1934 (235 ILCS 5/7–5, 7–9 (West 1996)). The Commission affirmed. Pooh Bah petitioned for rehearing. 235 ILCS 5/7–10 (West 1996). When that petition was denied, Pooh Bah sought judicial review in the circuit court of Cook County pursuant to this state's Administrative Review Law (735 ILCS 5/3–101 *et seq.* (West 1996)). See 235 ILCS 5/7–9, 7–11 (West 1996). The request for judicial review was asserted by Pooh Bah by means of a new count added to an amended complaint it filed in connection with its civil action for declaratory and injunctive relief, which remained pending.[8]

---

[8]Pooh Bah also sought review of the revocation of its other municipal licenses. With respect to those revocations, it proceeded by means of a petition for a common law writ of *certiorari*, which it included as an additional new count in its amended complaint. The propriety of the procedures employed by Pooh Bah for securing administrative review has not been challenged and is not at issue in this appeal.

Revocation of Pooh Bah's municipal licenses was stayed while judicial review of the revocation decision was underway and Pooh Bah's civil action continued. The City, however, did not wait for those matters to be resolved before taking further action. It filed a counterclaim against Pooh Bah for equitable and other relief. The basis for its counterclaim was that the strip club operated by the company at 1531 North Kingsbury Street violated section 8–4–090(a) of the Chicago Municipal Code. Under that statute,

> "[a]ny premises used for prostitution, illegal gambling, illegal [drug] trafficking *** or any other activity that constitutes a felony, misdemeanor, business offense or petty offense under federal, state or municipal law is hereby declared to be a public nuisance ***." Chicago Municipal Code §8–4–090(a) (2005).

In the City's view, Pooh Bah was committing a business or petty offense within the meaning of this statute by allowing its entertainers to engage in live acts, demonstrations, dances or exhibitions which expose to public view portions of the buttocks and female breasts at or below the areolae in violation of section 4–60–140(d) of the Municipal Code.

The foregoing proceedings, which we shall designate as the license revocation case, were protracted. Because the license revocations had been stayed pending review, however, Pooh Bah's municipal licenses remained in effect and the company was able to continue operating its strip club at 1531 North Kingbury Street throughout the remainder of the 1990s. In 1999, further investigation by undercover police officers revealed that dancers at the club continued to engage in the type of conduct which had triggered the initial license revocation proceedings six years earlier. The City therefore filed a new action in the circuit court of Cook County to obtain injunctive relief to shut down the club.

The basis for the City's new claim was essentially the same as that asserted in connection with the original license revocation case. According to the City, Pooh Bah had violated and continues to violate section 4–60–140(d) of the Municipal Code of Chicago by "causing, encouraging or permitting" female performers at the club to engage in dances or exhibitions "which expose to public view portions of the female breast at or below the areola, the buttocks, the pubic hair

-10-

regions and portions of the genitalia." The City further alleged that Pooh Bah was in violation of section 8–4–090(a) of the Chicago Municipal Code, the city's public nuisance ordinance. Unlike the City's counterclaim in Pooh Bah's civil action challenging the license revocation, the City's public nuisance claim in this case not only charged violation of the liquor ordinance, it asserted that Pooh Bah had caused, encouraged and permitted female performers to engage in prostitution and to solicit for prostitution.

After filing its new complaint for injunctive relief, the City moved for issuance of a preliminary injunction. Following discovery and a series of hearings extending over several months, the circuit court ruled in January of 2001 that section 4–60–140(d) of the Municipal Code of Chicago contravened the first and fourteenth amendments to the United States Constitution (U.S. Const, amends. I, XIV) and article I, section 4, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §4) and therefore could not serve as the predicate for the City's claim that Pooh Bah's strip club was being operated in a manner that constitutes a public nuisance. Concluding that the City had failed to establish that operation of the strip club created a public nuisance in any other way, the circuit court denied the City's motion for a preliminary injunction.

By agreement of the parties, the circuit court amended its ruling, *nunc pro tunc*, on May 3, 2001, to clarify certain of its provisions. In a separate order entered the same day, the circuit court also granted a joint motion by the parties to consolidate the license revocation case with the public nuisance case and to adopt the evidentiary record developed in connection with the motion for a preliminary injunction as the basis for resolution of the license revocation and public nuisance cases on the merits.[9] In yet a third order dated May 3, 2001, the court entered judgment in favor of Pooh Bah and against the City on the City's public nuisance claims; reversed the decision of the liquor appeal commission upholding revocation of Pooh Bah's municipal licenses; vacated the revocation of those licenses; reserved

---

[9]The agreed order reserved to the City the right to present additional evidence regarding the amount of fines that could be imposed on Pooh Bah in the event the City prevailed on the merits.

for future consideration various related and subsidiary issues; and made an express written finding that there was no just reason for delaying enforcement or appeal.

The City took an interlocutory appeal from the circuit court's judgement.[10] Rejecting the circuit court's position, the appellate court held that section 4–60–140(d) of the Municipal Code of Chicago does not violate either the federal or the Illinois Constitution. Because the ordinance is not unconstitutional, the appellate court further held that violation of the ordinance could serve as the basis for (1) revoking Pooh Bah's municipal licenses and (2) finding that Pooh Bah's operation of the strip club constituted a public nuisance. The appellate court therefore reversed the circuit court's judgment and remanded for further proceedings with respect to both the license revocation case and the City's public nuisance claim. Nos. 1–01–0592, 1–01–1932 cons. (unpublished order under Supreme Court Rule 23). After failing to persuade the appellate court to grant rehearing, Pooh Bah petitioned our court for leave to appeal. 177 Ill. 2d R. 315.[11] We granted that petition, and the cause is now before us for review.

In resolving this appeal, the pivotal inquiry is whether section 4–60–140(d) of the Municipal Code of Chicago violates either the United States or the Illinois Constitution. When assessing the validity of municipal ordinances, our analysis is guided by the same standards applicable to statutes. *City of Chicago v. Morales*, 177 Ill. 2d 440, 447 (1997). As with statutes, municipal ordinances are presumed to be valid. *Chavda v. Wolak*, 188 Ill. 2d 394, 398 (1999). The burden of rebutting that presumption is on the party challenging the law's validity. *La Salle National Bank v. Evanston*, 57 Ill.2d 415, 428 (1974). Courts are obligated to uphold the constitutionality of

------

[10]Although the procedural basis for the appeal was not specified, interlocutory review was permissible under Supreme Court Rules 304(a) (155 Ill. 2d R. 304(a)) and 307(a)(1) (188 Ill. 2d R. 307(a)(1)).

[11]Perry Mandera, who, through ACE Enterprises is now the sole owner of Pooh Bah, was a party to the proceedings in the lower courts and joined in Pooh Bah's petition for leave to appeal to our court. For purposes of this appeal, his position is identical to Pooh Bah's, and reference to Pooh Bah in the discussion which follows should be understood to include him.

ordinances whenever it is reasonably possible to do so. *City of Chicago v. Alton R.R. Co.*, 355 Ill. 65, 75 (1933). Whether a legislative enactment is constitutional presents a question of law which we review *de novo*. See *O'Brien v. White*, 219 Ill. 2d 86, 98 (2006).

We consider first Pooh Bah's contention that section 4–60–140(d) of the Municipal Code of Chicago violates the first amendment to the United States Constitution. The first amendment is binding on the states through the fourteenth amendment's due process clause. *People v. Alexander*, 204 Ill.2d 472, 476 (2003). It provides, in part, that "Congress shall make no law *** abridging the freedom of speech." U.S. Const., amend. I.

Although the first amendment literally forbids only the abridgement of freedom of speech, the United States Supreme Court has long recognized that its protections are not limited to the written or spoken word. They may also extend to expressive conduct. *Texas v. Johnson*, 491 U.S. 397, 404, 105 L. Ed. 2d 342, 353, 109 S. Ct. 2533, 2539 (1989). Generally speaking, the first amendment prevents the government from proscribing speech or expressive conduct because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid. Nevertheless, restrictions upon the content of speech have traditionally been permitted in a few limited areas which are " 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383, 120 L. Ed. 2d 305, 317, 112 S. Ct. 2538, 2543 (1992), quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 86 L. Ed. 1031, 1035, 62 S. Ct. 766, 769 (1942). Under the first amendment jurisprudence developed by the United States Supreme Court, freedom of speech does not include freedom to ignore these traditional limitations. *R.A.V. v. City of St. Paul*, 505 U.S. at 383, 120 L. Ed. 2d at 317, 112 S. Ct. at 2543.

The municipal ordinance challenged in this case pertains to live acts, demonstrations, dances or exhibitions which expose to public view the performer's genitals, pubic hair, buttocks or, in the case of female performers, any portion of the breast at or below the areola. The ordinance does not bar all such performances, only those that take place at establishments licensed to serve alcohol. At the time the license revocations were initiated in this case, the United States

Supreme Court adhered to the view that where, as here, the sale of alcohol is involved, the regulatory authority conferred on states by the twenty-first amendment to the United States Constitution (U.S. Const., amend. XXI) gave states and their political subdivisions the power to ban nude dancing. Under the Court's analysis, the broad powers of the states to regulate the sale of liquor pursuant to the twenty-first amendment outweighed any first amendment interest in nude dancing. The state therefore had the authority to ban nude dancing as a part of its liquor licensing program. *City of Newport v. Iacobucci*, 479 U.S. 92, 95, 93 L. Ed. 2d 334, 339, 107 S. Ct. 383, 385 (1986), quoting *California v. LaRue*, 409 U.S. 109, 114, 34 L. Ed. 2d 342, 349-50, 93 S. Ct. 390, 395 (1972). As the Court noted in *New York State Liquor Authority v. Bellanca*, 452 U.S. 714, 718, 69 L. Ed. 2d 357, 361, 101 S. Ct. 2599, 2602 (1981):

> "Whatever artistic or communicative value may attach to topless dancing is overcome by the State's exercise of its broad powers arising under the Twenty-first Amendment. Although some may quarrel with the wisdom of such legislation and may consider topless dancing a harmless diversion, the Twenty-first Amendment makes that a policy judgment for the state legislature, not the courts."

See also *California v. LaRue*, 409 U.S. 109, 34 L. Ed. 2d 342, 93 S. Ct. 390 (1972) (given broad sweep of twenty-first amendment, regulations prohibiting explicitly sexual live entertainment and films in bars and other establishments licensed to dispense liquor by the drink not facially invalid).

Under the foregoing authority, section 4–60–140(d) of the Municipal Code of Chicago, which prohibits nude entertainment in establishments licensed to sell alcohol by the drink, would clearly not be subject to challenge on first amendment grounds. During the pendency of this litigation, however, the United States Supreme Court altered its view of the interplay between the first and twenty-first amendments. In *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516, 134 L. Ed. 2d 711, 736, 116 S. Ct. 1495, 1514 (1996), the Court held that while the twenty-first amendment

> "limits the effect of the dormant Commerce Clause on a State's regulatory power over the delivery or use of intoxicating beverages within its borders, 'the Amendment

does not license the States to ignore their obligations under other provisions of the Constitution.' [Citation.]"

Noting its specific holdings in prior cases that "the Twenty-first Amendment does not in any way diminish the force of the Supremacy Clause [citations]; the Establishment Clause [citation] or the Equal Protection Clause [citation]," the Court concluded that the same should also be true with respect to the free speech clause. *44 Liquormart*, 517 U.S. at 516, 134 L. Ed. 2d at 736, 116 S. Ct. at 1514-15. It therefore held "the Twenty-first Amendment does not qualify the constitutional prohibition against laws abridging the freedom of speech embodied in the First Amendment." *44 Liquormart*, 517 U.S. at 516, 134 L. Ed. 2d at 736, 116 S. Ct. at 1515.

Although the Court thus disavowed the reasoning employed in *City of Newport v. Iacobucci*, *New York State Liquor Authority v. Bellanca*, and *California v. LaRue*, insofar as it relied on the twenty-first amendment, it distinguished cases such as *LaRue*, which involved the regulation of nude dancing in places where alcohol was served. The Court held that "[e]ntirely apart from the Twenty-first Amendment, the State has ample power to prohibit the sale of alcoholic beverages in inappropriate locations." *44 Liquormart*, 517 U.S. at 515, 134 L. Ed. 2d at 735, 116 S. Ct. at 1514. One of those locations is an establishment where nude dancing is allowed. Accordingly, the Court held that its "analysis in *LaRue* would have led to precisely the same result if it had placed no reliance on the Twenty-first Amendment." *44 Liquormart*, 517 U.S. at 515, 134 L. Ed. 2d at 735, 116 S. Ct. at 1514.

Four years after *44 Liquormart* was decided, the United States Supreme Court examined the validity of a municipal public indecency ordinance which made it an offense to intentionally appear in public in a "state of nudity." Under that ordinance, whose provisions were similar to those at issue in this case, "nudity" was defined to include the "showing of the *** buttocks with less than a fully opaque covering; the showing of the female breast with less than a fully opaque covering of any part of the nipple; *** or the exposure of any device worn as a cover over the nipples and/or areola of the female breast, which device simulates and gives the realistic appearance of nipples and/or areola." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 283

n.*, 146 L. Ed. 2d 265, 274 n.*, 120 S. Ct. 1382, 1388 n.* (2000). Unlike the matter before us today, these prohibitions were not limited to establishments licensed to serve alcohol.

Pap's, a Pennsylvania corporation which operated Kandyland, an establishment featuring totally nude erotic dancing by women, challenged the ordinance on the grounds that its public nudity provisions violated the first and fourteenth amendments to the United States Constitution. Although the Pennsylvania Supreme Court upheld the corporation's challenge (*Pap's A.M. v. City of Erie*, 553 Pa. 348, 719 A.2d 273 (1998)), the United States Supreme Court reversed and remanded. In a plurality opinion authored by Justice O'Connor, the Court held that while erotic nude dancing is expressive conduct, it falls "only within the outer ambit of the First Amendment's protection." *Pap's A.M.*, 529 U.S. at 289, 146 L. Ed. 2d at 278, 120 S. Ct. at 1391. Concluding that the ordinance was directed at combating negative secondary effects associated with adult establishments and was unrelated to the suppression of the erotic message conveyed by nude dancing, the Court held that it was not subject to strict scrutiny. Rather, its validity turned on whether it passed the less stringent intermediate standard set forth in *United States v. O'Brien*, 391 U.S. 367, 20 L. Ed. 2d 672, 88 S. Ct. 1673 (1968). *Pap's A.M.*, 529 U.S. at 296, 146 L. Ed. 2d at 282, 120 S. Ct. at 1394-95.

Under *O'Brien*, a content-neutral regulation will be upheld if it (1) is within the constitutional power of the government, (2) furthers an important or substantial governmental interest, (3) is unrelated to the suppression of free expression, and (4) restricts first amendment freedoms no further than is essential to further the government's interest. *O'Brien*, 391 U.S. at 377, 20 L. Ed. 2d 680, 88 S. Ct. at 1679 (1968). The Court in *Pap's A.M.* held that the nude-dancing ordinance at issue in that case was justified under these standards. According to the court, the municipality's efforts to protect public health and safety were clearly within its police powers. The ordinance furthered the city's undeniably important interest in combating the harmful secondary effects associated with nude dancing. *Pap's A.M.*, 529 U.S. at 296-97, 146 L. Ed. 2d at 282-83, 120 S. Ct. at 1395. It was unrelated to the suppression of free expression, and "any incidental impact on the expressive element of nude dancing [was] *de*

*minimus*," leaving "ample capacity to convey the dancer's erotic message." *Pap's A.M.*, 529 U.S. at 301, 146 L. Ed. 2d at 286, 120 S. Ct. at 1397.

As we have indicated, the public indecency ordinance at issue in *Pap's A.M.* was general in nature. Unlike section 4–60–140(d) of the Municipal Code of Chicago, its restrictions were not limited to establishments licensed to sell alcoholic beverages. In the years following *44 Liquormart* and *Pap's A.M.*, the United States Supreme Court itself has not specifically addressed the framework which should be followed in analyzing first amendment challenges to adult entertainment restrictions contained in municipal liquor regulations. The issue was, however, recently addressed by the United States Court of Appeals for the Seventh Circuit in *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702 (7th Cir. 2003).

*Ben's Bar* concerned an ordinance enacted by the Village of Somerset, Wisconsin that, in part, prohibited the sale, use or consumption of alcohol on the premises of "sexually oriented businesses." Under the village's regulatory scheme, an establishment fell within the definition of "sexually oriented business," and therefore could not serve alcohol, if it featured nude or seminude dancers. For purposes of the ordinance, nudity was defined as "the appearance of the human bare anus, anal cleft or cleavage, pubic area, male genitals, female genitals, or the nipple or areola of the female breast, with less than a fully opaque covering; or showing of the covered male genitals in a discernibly turgid state." *Ben's Bar*, 316 F.3d at 706 n.5. Seminudity was "the exposure of a bare male or female buttocks or the female breast below a horizontal line across the top of the areola at its highest point with less than a complete and opaque covering." *Ben's Bar*, 316 F.3d at 708.

The village's reasons for enacting this ordinance were expressly noted in the "legislative findings" section of the ordinance itself. That section stated:

> "Based on evidence concerning the adverse secondary effects of Sexually Oriented Businesses on the community in reports made available to the Village Board, and on the holdings and findings in [numerous Supreme Court, federal appellate, and state appellate judicial decisions], as well as studies and summaries of studies conducted in other cities ...

-17-

and findings reported in the Regulation of Adult Entertainment Establishments in St. Croix County, Wisconsin; and the Report of the Attorney General's Working Group of Sexually Oriented Businesses ... the Village Board finds that:

(a) Crime statistics show that all types of crimes, especially sex-related crimes, occur with more frequency in neighborhoods where sexually oriented businesses are located.

(b) Studies of the relationship between sexually oriented businesses and neighborhood property values have found a negative impact on both residential and commercial property values.

(c) Sexually oriented businesses may contribute to an increased public health risk through the spread of sexually transmitted diseases.

(d) There is an increase in the potential for infiltration by organized crime for the purpose of unlawful conduct.

(e) The consumption of alcoholic beverages on the premises of a Sexually Oriented Business exacerbates the deleterious secondary effects of such businesses on the community." (Emphasis omitted.) *Ben's Bar*, 316 F.3d at 705.

Following enactment of this ordinance, but two months before it was to take effect, a bar that provided nude and seminude dancing and that held a liquor license issued by the village, along with two of the bar's dancers, filed an action against the village asserting, *inter alia*, that the ordinance violated their rights to free expression under the first amendment. *Ben's Bar*, 316 F.3d at 705. The trial court rejected that claim and granted summary judgment in favor of the village. The bar appealed, arguing that the trial court erred in concluding that the ordinance did not constitute an unconstitutional restriction on nude dancing. *Ben's Bar*, 316 F.3d at 707.

In undertaking its review of the trial court's judgment, the court of appeals began by dismissing as fallacious the bar's contention that the ordinance was directed at the dancer's attire, or lack thereof. The ordinance, the court held, "restricts the sale and consumption of alcoholic beverages in establishments that serve as venues for adult entertainment, not the attire of nude dancers." *Ben's Bar*, 316 F.3d at 708. The court then proceeded to review recent United States

Supreme Court authority governing adult entertainment regulations, including *44 Liquormart* and *Pap's A.M.* and its adoption of *O'Brien*'s four-part test. The court also discussed *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 152 L. Ed. 2d 670, 122 S. Ct. 1728 (2002). That decision, which followed *Pap's A.M.*, upheld, at the summary judgment stage, an ordinance prohibiting multiple adult entertainment businesses from operating in the same building. The primary issue in the case was the appropriate standard for determining whether the ordinance served a substantial governmental interest. No majority could be reached on that question, but Justice Kennedy concurred in the plurality's overall conclusion that a municipality's initial burden of demonstrating a substantial government interest in regulating the adverse secondary effects associated with adult entertainment is slight. *Ben's Bar*, 316 F.3d at 722. "As to this," he observed,

> "we have consistently held that a city must have latitude to experiment, at least at the outset, and that very little evidence is required. [Citations.] As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners. [Citation.] The Los Angeles City Council knows the streets of Los Angeles better than we do. [Citations.] It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion." *Alameda Books*, 535 U.S. at 451-52, 152 L. Ed. 2d at 691, 122 S. Ct. at 1742-43.

Based on its review of the authorities set forth above and others, the Seventh Circuit concluded that under controlling United States Supreme Court precedent, a liquor regulation prohibiting the sale or consumption of alcohol on the premises of adult entertainment establishments is constitutional if:

> "(1) the State is regulating pursuant to a legitimate governmental power [citation]; (2) the regulation does not completely prohibit adult entertainment [citation]; (3) the regulation is aimed not at the suppression of expression, but rather at combating the negative secondary effects caused by adult entertainment establishments [citation]; and (4) the regulation is designed to serve a substantial government interest, narrowly tailored, and reasonable alternative avenues

of communication remain available [citation]; *or*, alternatively, the regulation furthers an important or substantial government interest and the restriction on expressive conduct is no greater than is essential in furtherance of that interest. [Citation.]" (Emphasis in original.) *Ben's Bar*, 316 F.3d at 722.

Step four of this test encapsulates the so-called intermediate standard of scrutiny. *Joelner v. Village of Washington Park*, 378 F.3d 613, 622 (7th Cir. 2004).[12]

Applying the foregoing analytical framework to the Somerset village ordinance, the Seventh Circuit held that the village's regulation of alcohol sales and consumption in inappropriate locations was clearly within its general police powers. The ordinance was therefore of the type which the government has the constitutional authority to enact. *Ben's Bar*, 316 F.3d at 722, citing *Pap's A.M.*, 529 U.S. at 296, 146 L. Ed. 2d at 282-83, 120 S. Ct. at 1395. Next, the court concluded that the ordinance did not completely bar Ben's Bar employees from conveying an erotic message. In the court's view, it merely prohibited alcohol from being sold or consumed on the premises of adult entertainment establishments. *Ben's Bar*, 316 F.3d at 723. With respect to step three, the court determined, after reviewing the record, that the predominant concern of the village in adopting the ordinance was the negative secondary effects attendant to sexually oriented businesses, such as increased crime and reduced property values in neighboring business and residential areas. The village was not attempting to suppress any speech or conduct protected by the first amendment. *Ben's Bar*, 316 F.3d at 723-24.

Because the Village's ordinance thus satisfied these preliminary standards, the court proceeded to the fourth and final step. In applying that step, the court explained that it was required to determine whether the village had adequately demonstrated that there was a

---

[12]If a regulation fails to satisfy either step two or step three, a more rigorous standard will apply. The regulation will have to withstand strict scrutiny in order to pass constitutional muster. *Joelner v. Village of Washington Park*, 378 F.3d at 622-23. Pooh Bah argues that the strict scrutiny standard should govern this case. For the reasons set forth later in this opinion, Pooh Bah is incorrect.

connection between the speech regulated by the ordinance and the secondary effects that motivated the ordinance's adoption. As we have previously detailed, the record showed that the village relied on numerous judicial decisions, studies from 11 different cities, "findings reported in the Regulation of Adult Entertainment Establishments of St. Croix, Wisconsin," and the Report of the Attorney General's Working Group of Sexually Oriented Businesses (State of Minnesota, June 6, 1989) to support its conclusion that adult entertainment produces adverse secondary effects. *Ben's Bar*, 316 F.3d at 725. The court opined that this evidentiary record "fairly support[ed] the Village's proffered rationale for [the ordinance], and that [the bar had] failed 'to cast direct doubt on this rationale.' " *Ben's Bar*, 316 F.3d at 726, quoting *Alameda Books*, 535 U.S. at 438, 152 L. Ed. 2d at 683, 122 S. Ct. at 1736.

In finding the village's evidentiary showing to be sufficient, the Seventh Circuit rejected a claim by the bar that the village should have been required to conduct its own studies, at the local level, to determine whether adverse secondary effects result when liquor is served on the premises of adult entertainment establishments. Citing various decisions by the United States Supreme Court, the court held that a municipality is not required to conduct new studies or produce evidence independent of that already generated by other cities " 'so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.' [Citation.]" *Ben's Bar*, 316 F.3d at 725. The Seventh Circuit also rejected the bar's argument that the village's case was fatally deficient because it had not adduced any written reports relating specifically to the effects of serving alcohol in establishments offering nude and seminude dancing. Again citing precedent from the United States Supreme Court, it held that it was entirely reasonable for the village to conclude that barroom nude dancing was likely to produce adverse secondary effects at the local level even in the absence of specific studies on the matter. As the New York state legislature noted in connection with the legislation challenged in *Bellanca*, "[c]ommon sense indicates that any form of nudity coupled with alcohol in a public place begets undesirable behavior." N.Y. State Legis. Ann. 150 (1977), quoted in *Bellanca*, 452 U.S. at 718, 69 L. Ed. 2d at 361, 101 S. Ct. at 2601. See also *Ben's Bar*, 316 F.3d at 726.

Turning next to the question of whether the village's ordinance was narrowly tailored, the court reiterated that the ordinance did not, in fact, impose any restrictions at all on a dancer's ability to convey an erotic message. Rather, it merely prohibited sexually oriented businesses from serving alcohol to customers while nude or seminude dancing is going on. That, the court explained, is not a restriction on erotic expression, but a prohibition of nonexpressive conduct (serving and consuming alcohol) during the presentation of expressive conduct. In the court's view, the first amendment does not entitle a bar, its dancers or its patrons to have alcohol available while nude or seminude dancing is taking place. *Ben's Bar*, 316 F.3d at 726. The court cited numerous authorities from other jurisdictions to the same effect. See, *e.g.*, *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Board*, 99 Cal. App. 4th 880, 895, 121 Cal. Rptr. 2d 729, 741 (2002) ("The state *** has not prohibited dancers from performing with the utmost level of erotic expression. They are simply forbidden to do so in establishments that serve alcohol, and the Constitution is not thereby offended").

The court next observed that the village's ordinance was limited to adult entertainment establishments and was inapplicable to theaters, performing art centers and other venues where performances of serious artistic merit are regularly offered. *Ben's Bar*, 316 F.3d at 727. Finally, it noted that the ordinance's prohibition was no greater than was essential to furtherance of the village's substantial interest in combating the secondary effects resulting from the combination of nude or seminude dancing and alcohol consumption. That was so, in the court's view, "because, as a practical matter, a complete ban of alcohol on the premises of adult entertainment establishments is the *only* way the Village can advance that interest." (Emphasis in original.) *Ben's Bar*, 316 F.3d at 727.[13]

---

[13]Because it believed that alcohol prohibition was, as a practical matter, the least restrictive means of furthering the village's interest in combating the negative secondary effects resulting from the combination of adult entertainment and alcohol consumption, the court did not undertake a specific analysis of the alternative standard set forth in step four of its four-part test. None was necessary, as the result would be the same. *Ben's Bar*, 316 F.3d at 725 n.31.

In light of the foregoing, the court concluded that the Village's ordinance did not violate the first amendment. Wrote the court:

> "The regulation has no impact whatsoever on the tavern's ability to offer nude or semi-nude dancing to its patrons; it seeks to regulate alcohol and nude or semi-nude dancing without prohibiting either. The citizens of the Village of Somerset may still buy a drink and watch nude or semi-nude dancing. They are not, however, constitutionally entitled to do both at the same time and in the same place. *Gary*, 311 F.3d at 1338 (holding that there is no generalized right to associate with other adults in alcohol-purveying establishments with other adults). The deprivation of alcohol does not prevent the observer from witnessing nude or semi-nude dancing, or the dancer from conveying an erotic message. Perhaps a sober patron will find the performance less tantalizing, and the dancer might therefore feel less appreciated (not necessarily from the reduction in ogling and cat calls, but certainly from any decrease in the amount of tips she might otherwise receive). And we do not doubt Ben's Bar's assertion that its profit margin will suffer if it is unable to serve alcohol to its patrons. But the First Amendment rights of each are not offended when the show goes on without liquor." *Ben's Bar*, 316 F.3d at 728.

The analysis employed by the court in *Ben's Bar*, 316 F.3d 702, was subsequently followed by the Seventh Circuit in *Joelner v. Village of Washington Park*, 378 F.3d 613 (7th Cir. 2004). While decisions of the Seventh Circuit are not binding on this tribunal (*Bowman v. American River Transportation Co.*, 217 Ill. 2d 75, 91 (2005)), its decision in *Ben's Bar* was recently adopted by the United States Court of Appeals for the Third Circuit in *181 South, Inc. v. Fischer*, 454 F.3d 228 (3d Cir. 2006), and we believe that it constitutes persuasive authority on the issues presented by this case. We therefore elect to follow it.

Under the four-part test articulated in *Ben's Bar*, section 4–60–140(d) of the Municipal Code of Chicago, the ordinance at issue in this case, does not offend the first amendment to the United States Constitution. First, as with the Somerset village ordinance at issue in *Ben's Bar*, section 4–60–140(d) of Chicago's Municipal Code was

-23-

directed toward the regulation of alcohol sales and consumption in inappropriate locations, a matter within the City's general police powers. See *BZAPS, Inc. v. City of Mankato*, 268 F.3d 603, 608 (8th Cir. 2001) (city is entitled under its police power to prohibit the sale of alcohol in a location that features adult entertainment). Second, the ordinance does not completely prohibit nude or seminude dancing. It merely prohibits such performances at establishments licenced to sell alcohol. Where alcohol is not sold or served, nude and seminude dancing is not prohibited by the City of Chicago. Venues providing nude or seminude dancing have operated and continue to operate in the City in accordance with state law and local ordinances.

We next consider the third step of *Ben's Bar*, which specifies that the challenged regulation must be aimed not at the suppression of expression, but rather at combating the negative secondary effects caused by adult entertainment establishments. Resolution of this issue turns on the predominate concerns motivating the law's enactment. *Ben's Bar*, 316 F.3d at 723; see *Joelner*, 378 F.3d at 624; *R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402, 407-08 (7th Cir. 2004); *G.M. Enterprises v. Town of St. Joseph*, 350 F.3d 631, 637 (7th Cir. 2003). In evaluating a municipality's regulatory motivations, we are free to take into account a wide variety of materials, including, but not limited to, the text of the regulation or ordinance, any preamble or express legislative findings associated with it, and studies and information of which legislators were clearly aware. See *Joelner*, 378 F.3d at 624. The inquiry at this stage of the analysis is highly deferential to the legislative body that enacted the ordinance. See *XLP Corp. v. County of Lake*, 359 Ill. App. 3d 239, 246 (2005).

Just as the Somerset village board made legislative findings in support of the ordinance upheld by the Seventh Circuit in *Ben's Bar*, the Chicago city council detailed its concerns in enacting the ordinance at issue in this case. The ordinance was part of a package of ordinances and ordinance amendments adopted in 1993 to establish "adult uses" within various zoning districts in the City. In the preamble to those amendments, the Chicago city council explained:

> "Experience in the City of Chicago as well as in other cities has shown that adult uses in certain areas of a city may lead to increased levels of criminal activity, including but not limited to prostitution and assault; and

-24-

Merchants in some commercial areas of the City justifiably are concerned that the location of adult use establishments in such areas will have a serious negative effect; and

In fact, the experiences of Seattle, Washington, and Detroit, Michigan, among other cities, have demonstrated that adult use establishments may degrade the quality of the area in which they are locate and may have a blighting effect on a city; and

Adult uses which continued to operate as nonconforming uses have had a deleterious effect on surrounding neighborhoods to a much greater extent than many other uses; and

\* \* \*

The reasonable regulation of adult uses will provide for the protection of property values and will protect City residents and persons who work within the City from the adverse effects of adult uses, while providing those who desire to patronize adult use establishments a reasonable opportunity to do so in areas of the establishments; and

Adult uses should be treated as special uses to enable individualized consideration of the effects of an adult use on the surrounding neighborhood \*\*\*."

There is nothing in the record to suggest that these objectives were pretextual. Thomas Smith, assistant commissioner for zoning for the City of Chicago's department of planning and development, was personally involved in the formulation of the City's adult use ordinances and he testified in these proceedings. Echoing many of the circumstances reported by Officer O'Brien during his testimony, Smith explained the negative secondary effects adult businesses had caused in the City in the past, particularly in the Old Town, Rush Street and South Loop areas. Smith recounted a variety of criminal activities that were associated with strip clubs and cabarets where liquor was served and "B girls" plied their trade. Conventioneers were bilked of their money. Prostitution was rampant. Illegal earnings were collected by club proprietors and not reported to taxing authorities.

In researching how best to deal with the negative secondary effects of strip clubs and other adult entertainment establishments,

Smith's department consulted groups such as the American Planning Association and the National Institute of Municipal Law Officers. It also obtained and reviewed numerous studies conducted in other major metropolitan areas in addition to those specifically noted by the city council. Most were prepared by city planning departments in connection with local police departments. Among them were reports from the cities of Phoenix, Indianapolis, Minneapolis, St. Paul, and Los Angeles. Some, including the Minneapolis and St. Paul studies, took into account the specific relationship between the combination of alcohol sales and adult uses on the incidence of neighborhood crime. According to Smith's testimony, the studies were consistent in showing that the presence of adult entertainment establishments, including strip clubs which served liquor, led to higher crime rates.

While we do not know whether the additional studies discussed by Smith were expressly presented to the city council before it enacted the legislative package which included section 4–60–140(d) of the Municipal Code, those studies did inform the recommendations Smith made to the city council, and the concerns he expressed were, in turn, reflected in the legislative preamble adopted by the city council. When one considers the preamble, the text of the ordinance, the historical context in which the 1993 version of the law was enacted, and the undisputed fact that fully nude dancing is permitted by the City in establishments that do not serve alcohol, the notion that section 4–60–140(d) of the Municipal Code represents an effort by the City to restrict certain viewpoints or modes of expression is completely untenable. See *G.M. Enterprises*, 350 F.3d at 638.

In *R.V.S., L.L.C.*, 361 F.3d at 409-10, the court found that the predominate concerns motivating Rockford to enact a municipal ordinance regulating "exotic dancing nightclubs" related "to combating prostitution, crime and other negative externalities" notwithstanding the fact that the record included testimony by one of the city's aldermen, in response to questions regarding the purpose of the ordinance, that "there were some concerns that some people just don't like this type of entertainment." The Seventh Circuit correctly declined to give that testimony dispositive effect, noting, among other things, that "what motivates one legislator to support a statute is not necessarily what motivates others to enact it. [Citations.]" *R.V.S., L.L.C.*, 361 F.3d at 410. The City's position in this case is

-26-

unencumbered by even that level of uncertainty. In contrast to *R.V.S., L.L.C.*, there is nothing at all in this case to suggest, directly or indirectly, that the City harbored any hostility of any kind toward the expressive conduct in which the dancers at Pooh Bah's club were engaged. Based on the record before us here, combating the negative secondary effects caused by adult entertainment establishments was not only the predominate motive for the City's actions, it was the only motivation.

In an attempt to refute this conclusion, Pooh Bah argues that the language used in a prior version of section 4–60–140(d) of the Municipal Code can be read as evincing an intention by the city council to reach the content of expression rather than its secondary effects. That contention is untenable for three reasons. First, unlike the preamble applicable to the current version of the law, the language invoked by Pooh Bah, which states that the ordinance "controls the form of entertainment in places licensed to sell alcoholic beverages" is not part of the ordinance itself. It is merely a generic description of the legislation included by the committee on police, fire, personnel, schools and municipal institution in its recommendation to the city council that the ordinance be approved. Second, even if the committee's views could be imputed to the city council and even if the language it employed could be read as actually referring to the content of conduct that is protected, reference to content is not the same as suppression of content. *Sammy's of Mobile Ltd. v. City of Mobile*, 140 F.3d 993, 998 (11th Cir. 1998). Like the present law, the version of the ordinance invoked by Pooh Bah does not impose any limitations on nude or seminude dancing. Its effect is simply to ban alcohol sales where such dancing takes place. Finally, and perhaps most basically, the prior version of the law is not at issue here. It is the subsequent 1993 version of the ordinance that gave rise to these proceedings, and the preamble adopted in connection with that ordinance is what reflects the city council's motivation in adopting that version of the law.

Because section 4–60–140(d) of the Chicago Municipal Code thus satisfies steps two and three of the test set forth in *Ben's Bar*, we proceed to step four, namely, whether the ordinance is designed to serve a substantial government interest, narrowly tailored, and reasonable alternative avenues of communication remain available *or*,

-27-

alternatively, the ordinance furthers an important or substantial government interest and the restriction on expressive conduct is no greater than is essential in furtherance of that interest. *Ben's Bar*, 316 F.3d at 722. As previously discussed, this inquiry encapsulates the intermediate standard of review applicable to first amendment challenges to adult entertainment regulations. Under *Ben's Bar* and the precedent on which it is based, assessing whether an ordinance serves a substantial government interest under this standard requires a court to determine whether the municipality has adequately demonstrated that a connection exists between the speech regulated by the ordinance and the secondary effects the ordinance was designed to address. *Ben's Bar*, 316 F.3d at 724. In making this determination, the appropriate focus is not the actual intent of the governmental body. The government's actual intent relates to the earlier inquiry regarding the predominant motivation behind its decision to enact the law. The question at this stage is whether the government can show that the regulation serves a current governmental interest. See *Giovani Caradola, Ltd. v. Bason*, 303 F.3d 507, 515 (4th Cir. 2002). The harms to which the law is addressed must be real, not merely conjectural, and the law must alleviate those harms in a direct and material way. See *Giovani Caradola, Ltd.*, 303 F.3d at 515, quoting *Satellite Broadcasting & Communications Ass'n v. FCC*, 275 F.3d 337, 356 (4th Cir. 2001).

The current governmental interest advanced by the City in support of section 4–60–140(d) of its Municipal Code is the avoidance of the negative secondary effects which result from the sale and consumption of alcohol at adult entertainment establishments. That "[l]iquor and sex are an explosive combination" (*Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1124 (7th Cir. 2001) is a proposition so frequently confirmed by human experience that it can scarcely be questioned. Nude and topless dancing in bars has "a long history of spawning deleterious effects," including "prostitution and the criminal abuse and exploitation of young women." *Steakhouse, Inc. v. City of Raleigh*, 166 F.3d 634, 637 (4th Cir. 1999). Where alcohol is served in establishments offering nude or seminude dancing, secondary blight is frequently reported. Disturbances involving lascivious conduct, drunkenness, larcenies, assaults and narcotics are common. See, *e.g.*,

*Steakhouse, Inc.*, 166 F.3d at 637; *California v. LaRue*, 409 U.S. at 111, 34 L. Ed. 2d at 347-48, 93 S. Ct. at 393.

The negative effects of combining alcohol with sexual stimulation was corroborated in this case by Dr. Allen Kodish, a practicing psychiatrist and member of the faculty at the University of Chicago. Dr. Kodish, who was called as a witness by the City, testified that alcohol consumption facilitates sexual and aggressive impulses and impairs social judgment. When combined with sexual stimulation, it produces an effect "associated with an increase in violent sexual acting out, acts of criminal behavior." Because of this, drinking alcohol while viewing naked or nearly naked dancers can lead a person to act on various impulses, including touching, screaming, and engaging in fights or other risky behavior. While not everyone who drinks alcohol reacts that way, Kodish explained that the combination of alcohol and sexual stimulation increases the likelihood that they will. In support of his conclusions, Kodish discussed a study entitled "The Effects of Male Social Drinking on Fantasy," which showed that increased alcohol intake is associated with increased sexual and aggressive thoughts.

The City also adduced testimony from Dr. Wesley Skogan, a professor of political science at Northwestern University and a member of the University's Institute for Policy Research. According to Professor Skogan, research shows that establishments serving alcohol attract a significant amount of additional crime. Such establishments create the opportunity for crime by bringing the potential victim and the criminal together. Victims become more vulnerable because of alcohol's debilitating effects, thus creating an attractive situation for potential offenders. In explaining these circumstances, Professor Skogan discussed a number of studies and articles showing the relationship between alcohol consumption and crime. These studies, which demonstrated that establishments serving or selling alcohol do exacerbate crime, included "Bars, Blocks and Crime"; "Bars, Blocks and Crimes Revisited: Linking the Theory of Routine Activities to the Empiricism of 'Hot Spots' "; a study done on the City of Garden Grove, California; a report entitled "Additional Evidence that Taverns Enhance Nearby Crime"; and an article from the American Journal of Public Health. The Garden Grove study is particularly noteworthy because it showed that the combination of

retail alcohol sales and adult uses created a higher incidence of crime than resulted from retail alcohol sales or adult uses operating in isolation.

The conclusions reported by Dr. Kodish and Professor Skogan were consistent with those reached by Thomas Smith, the assistant commissioner for zoning, whose testimony we discussed earlier in this opinion. Like Skogan, Smith consulted studies involving the experience of other municipalities. He also drew on his own experience as an urban planner and the problems Chicago had experienced in the past. As we have previously noted, the city also presented the testimony of veteran city police officer Roger O'Brien, who described in detail the abundance of criminal activity that occurred in the late 1970s and early 1980s when strip clubs serving alcohol proliferated. In addition, the City buttressed its position by presenting to the circuit court judicial decisions from other jurisdictions involving attempts to regulate adult entertainment establishments, including strip clubs serving alcohol, within the confines of the first amendment.

Based on the foregoing, we believe that the evidentiary record here, as in *Ben's Bar*, fairly supported the rationale proffered by the City for the ordinance. That, however, does not end our inquiry. If the party challenging an ordinance can cast doubt on the municipality's rationale, either by demonstrating that the evidence adduced by the municipality does not support the proffered rationale or by furnishing evidence that disputes the municipality's factual findings, the burden will then shift back to the municipality to supplement the record with evidence renewing support for a theory that justifies the law. *World Wide Video of Washington, Inc. v. City of Spokane*, 368 F.3d 1186, 1193 (9th Cir. 2004); *G.M. Enterprises, Inc. v. Town of St. Joseph*, 350 F.3d 631, 639 (7th Cir. 2003).

In an attempt to trigger such a shift, Pooh Bah asserts that the City's evidence is fatally deficient because it did not include a study dealing specifically with the City of Chicago itself. Such an argument was specifically considered and rejected in *Ben's Bar*. We discussed the point previously and will state it again here. A municipality need not conduct new studies or produce evidence independent of that already generated by other cities before enacting an ordinance pertaining to the adverse secondary effects of adult entertainment

establishments so long as whatever evidence the city does rely on is reasonably believed to be relevant to the problem the city is attempting to address. *Ben's Bar*, 316 F.3d at 725. We note, moreover, that the City's position here was supported by its own historical experience when strip clubs had been permitted to serve alcohol to patrons in the past. Where actual experience from the municipality itself buttresses the conclusions reported in studies from other jurisdictions, those studies may be used by the municipality in support of its claims regarding negative secondary effects. See *XLP Corp.*, 359 Ill. App. 3d at 254.

Pooh Bah also challenges the City's position on the grounds that the studies upon which the City's witnesses relied contained scientific and methodological flaws. Pierre DeVise, a self-employed consultant retained by Pooh Bah, stated that he was not aware of studies showing a cause and effect relationship between liquor establishments featuring seminaked dancers and crime and did not believe that such a relationship existed. Peter Girandola, an assistant professor of psychology at the University of Kentucky, opined that there was no direct, positive relationship between viewing sexual stimuli and sexual "acting out behavior." In addition, Rolf Campbell, a planning and zoning consultant called to testify by Pooh Bah, stated that the seminude dancing conducted at Pooh Bah's club had no "negative impact on the orderly development of the immediately surrounding properties."

This testimony by Pooh Bah's experts was insufficient to trigger an obligation on the part of the City to supplement the record with additional evidence in support of its position. Campbell conceded, on cross-examination, that he had no opinion about the relationship between land use and crime and had conducted no research regarding the relationship between either alcohol or sexually oriented businesses and crime. DeVise actually admitted that a correlation has been shown to exist between sexually oriented businesses serving alcohol and increased incidence of crime, while Giranadola confirmed that alcohol consumption is related to a higher level of aggression. It is true that the City adduced no information dealing specifically with the potential secondary effects of permitting liquor to be sold where the dancers were covered to the extent required by section 4–60–140(d) of Chicago's Municipal Code, but no precedent requires the City to

obtain research targeting the exact activity that it wishes to regulate. The City is only required to rely on evidence "reasonably believed to be relevant" to the problem being addressed. The studies upon which the City relied regarding the secondary effects of alcohol sales and adult entertainment businesses satisfy that standard. See *Gammoh v. City of La Habra*, 395 F.3d 1114, 1133 (9th Cir. 2005).

We further note that the City's determination regarding the deleterious secondary effects of allowing adult entertainment establishments to serve liquor is entitled to a high degree of deference. "[A]necdotal evidence and reported experience can be as telling as statistical data and can serve as a legitimate basis for finding negative secondary effects." *World Wide Video of Washington, Inc. v. City of Spokane*, 227 F. Supp. 2d 1143, 1157 (E.D. Wash. 2002), *aff'd*, 368 F.3d 1186 (9th Cir. 2004), quoting *Stringfellow's of N.Y., Ltd. v. City of New York*, 91 N.Y.2d 382, 400, 694 N.E.2d 407, 417, 671 N.Y.S.2d 406, 416 (1998) cited with approval in *Center for Fair Public Policy v. Maricopa County*, 336 F.3d 1153, 1168 (9th Cir. 2003). The existence of academic studies said to indicate that the threatened harms are not real will not suffice to cast doubt on the local government's experience. See *City of Erie v. Pap's A.M.*, 529 U.S. 277, 300, 146 L. Ed. 2d 265, 285, 120 S. Ct. 1382, 1397 (2000) (plurality op.), citing *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 394, 145 L. Ed. 2d 886, 902, 120 S. Ct. 897, 908 (2000). The same is true of disagreement among academic experts. While the courts will not permit legislative bodies to rely on shoddy data, we also will not specify the methodological standards to which their evidence must conform. *Gammoh v. City of La Habra*, 395 F.3d at 1133. The Chicago city council knows the streets of Chicago better than we do. See *Alameda Books*, 535 U.S. at 451-52, 152 L. Ed. 2d at 691, 122 S. Ct. at 1743. The experience of other jurisdictions and of the City itself leaves little doubt that the secondary harms to which section 4–60–140(d) of the Municipal Code are addressed are real and not merely conjectural.

Because enforcement of section 4–60–140(d) of the Chicago Municipal Code has been stayed during the pendency of these proceedings, Pooh Bah's club has continued to sell alcohol while presenting seminude dancing. The amount of documented criminal activity reported during that period has been limited. Contrary to Pooh

Bah's view, however, we do not believe that this demonstrates that the City's professed concerns are unfounded.

While few in number, the particular incidents which have taken place at or around the club fall squarely within the type of activity shown by the evidence to be typical of establishments where alcohol and adult uses are combined. In addition to the incident discussed earlier in our opinion involving the customer who exposed himself and began masturbating in the middle of the club, the record reveals that police have been summoned to deal with assaults both inside and outside the club. The record also describes an incident in which a bartender was caught forging entries on credit card receipts to give herself higher tips.[14]

Wholly aside from that, we note again that the City's historical experience with strip clubs licensed to sell alcohol by the drink was substantial. Negative secondary effects were serious and pervasive. Such widespread effects may not have recurred yet, but neither has the proliferation of strip clubs serving alcohol. Because of the adult use ordinances enacted in 1993, which includes the version of section 4–60–140(d) of the Municipal Code at issue in this case, and the prompt enforcement of section 4–60–140(d) against Pooh Bah, Pooh Bah is the only establishment in the City where patrons can purchase and consume alcohol while watching nude or seminude women perform erotic dances. Perhaps that makes it easier to police. Perhaps the criminal activity is more difficult to detect. Whatever the explanation, the absence or apparent absence of crime at Pooh Bah's club does not render the ordinance constitutionally suspect. The first amendment does not require a municipality to ignore its own experience, the experience of other jurisdictions, and concerns which the courts have held to be a matter of "common sense" (*Ben's Bar*, 316 F.3d at 726) merely because the feared secondary effects have not yet materialized in connection with a particular adult entertainment establishment. See *SOB, Inc. v. County of Benton*, 317 F.3d 856 (8th Cir. 2003) (public indecency ordinance banning live nude dancing

---

[14]Incidents of prostitution were alleged as well, but it does not appear that any dancer or patron has yet been charged with prostitution or prostitution-related offenses.

upheld against first amendment challenge notwithstanding the existence of reports showing fewer police calls to the club than to a local gas station and suggesting that the value of properties near the club and another adult entertainment establishment had increased more from 1994 to 2001 than the value of properties near two businesses that did not feature nude dancing); *Artistic Entertainment, Inc. v. City of Warner Robins*, 223 F.3d 1306 (11th Cir. 2000) (that city council members may have had no specific knowledge about crime patterns near venue presenting live nude dancing did not render ordinance prohibiting sale of alcohol there invalid under the first amendment).

Having thus concluded that the evidentiary record fairly supports the City's rationale for section 4–60–140(d) of the Municipal Code and that Pooh Bah has failed to cast direct doubt on that rationale, we next consider whether the ordinance is narrowly tailored to the problem to which it is addressed, namely, the negative secondary effects associated with the combination of alcohol sales and nude or semi-nude dancing. In order to satisfy the "narrow tailoring" requirement, a regulation need not be " 'the least restrictive or least intrusive means of [achieving the stated governmental interest].' " *Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006), quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 105 L. Ed. 2d 661, 680, 109 S. Ct. 2746, 2757-58 (1989). Rather, the narrow tailoring requirement is satisfied so long as the substantial governmental interest which the law is designed to serve would be achieved less effectively in the law's absence and the law does not burden substantially more speech than is necessary to further the government's objective. *McGuire v. Reilly*, 260 F.3d 36, 48 (1st Cir. 2001); *Center for Fair Public Policy*, 336 F.3d at 1169.

That standard has clearly been satisfied here. Section 4–60–140(d) of the Municipal Code is tailored precisely to its objective: combating the negative secondary effects that flow from the combination of nude or seminude dancing and alcohol sales. *181 South, Inc. v. Fischer*, 454 F.3d 228 (3d Cir. 2006) (upholding against first amendment challenge state regulation forbidding erotic topless dancing in establishments licensed to sell liquor). There is no question that the City's goal could not be achieved as effectively absent the ordinance. Indeed, prohibiting establishments from offering both alcohol and nude or

seminude dancing is the only way the City can advance that interest. See *Ben's Bar*, 316 F.3d at 727. In addition, the ordinance goes no further than is essential to further the City's objective. Other courts which have considered similar laws have so held. See *2025 Emery Highway L.L.C. v. Bibb County*, 377 F. Supp. 2d 1310, 1336 (M.D. Ga. 2005) (requiring performers to "partially cover their breasts, buttocks, and genitals at venues where alcohol is sold 'is certainly the least restriction possible which would still further the [government's] interest in controlling the combustible mixture of alcohol and nudity' "), quoting *Sammy's of Mobile Ltd. v. City of Mobile*, 140 F.3d at 997; *Ben's Bar*, 316 F.3d at 727; *Wise Enterprises, Inc. v. Unified Government of Athens-Clarke Co.*, 217 F.3d 1360, 1365 (11th Cir. 2000).

Our final inquiry under step four of the test set forth in *Ben's Bar* is whether reasonable alternative avenues of communication remain available. The answer to that inquiry is unquestionably yes. As in *Ben's Bar*, the ordinance regulates nude and seminude dancing and the consumption of alcohol, but prohibits neither. The City of Chicago still offers enumerable opportunities for the sale and consumption of alcohol by the drink. It also permits venues to offer nude and seminude dancing, and such establishments operate lawfully in the City featuring performers who wear even less than the dancers at Pooh Bah's club. The only thing the City does not permit is for the two activities to be combined on the same premises and at the same time. Such a restriction is within the City's authority to impose, for the first amendment does not entitle a bar, its dancers or its patrons to have alcohol available during a presentation of nude or seminude dancing. *Ben's Bar*, 315 F.3d at 726, 728.

In that regard, we note that the record is utterly devoid of any testimony suggesting, directly or indirectly, that the availability of liquor bears in any way on the expressive component of the dancers' performances. Dancer Rachel Shaw, who testified under her stage name, Samantha, described her message as fantasy and fun, "the idea that the customer can have a beautiful stranger take their clothes off and dance for them and feel special." Melissa Candelaria, known at the club as "Malibu," repeated the fantasy theme. "It's a fantasy," she said, "of being their girl, which you never will, basically." Candelaria's objective included a pragmatic element as well. When dancers are up

on the main stage, Candelaria testified, "[w]e want to be noticed so that we can get a table dance when we get off the stage."

Cynthai Sudheimer, whom Pooh Bah patrons will recognize as "Christy," tries to convey the idea that she is "untouchable *** like a star ***, somebody that is a step above, higher, glamour-type person that is put up from everybody else." When asked at trial whether she had a message which she tries to convey on stage, "Star," whose actual name is Sara Jean Levorson, explained that she attempts to portray "my fantasy, sex appeal *** like having a good time, having a lot of fun." For Rhonda Bobo, who performs as "Kori Adams," the objective is to communicate to the audience who she is, that she is comfortable being on stage, that she is "here and available to entertain," and that she is "strong, confident, sexy, beautiful." Similarly, Vickie Bernal, a/k/a "Lee," viewed her performances as relating the message that women are beautiful. She wants her customers to look not only at her body, but also at her hair and her face. "I try to have them appreciate the whole me as a beautiful woman," she testified, "not just the body."

We cannot see and Pooh Bah has not suggested any reason why any of these messages cannot be expressed with equal effectiveness or viewed by patrons with equal appreciation absent the ability of those patrons to buy and consume alcohol while the performances are taking place. In *Ben's Bar*, 316 F.3d at 728, the Seventh Circuit postulated that prohibiting alcohol sales where nude or seminude dancing occurs may cause performers to suffer a reduction in tips. Based on the record, we are not sure that is necessarily so in this case. Testimony by some dancers indicated that they also work or have worked at different strip clubs where alcohol is not served, and it is not at all clear that any disparity existed between what they were paid at those establishments and what they earned at Pooh Bah's club. The situation with the club itself is different. Testimony by the club's owner suggests that the club's income would probably fall substantially if it could not offer alcohol along with nude and seminude dancing. That, however, is of no consequence. While the first amendment does require that establishments like the club be given a "reasonable opportunity" to disseminate protected speech, a "reasonable opportunity" does not include a concern for economic considerations. *Ben's Bar*, 316 F.3d at 726-27, citing *City of Renton v. Playtime*

-36-

*Theatres, Inc.*, 475 U.S. 41, 54, 89 L. Ed. 2d 29, 42, 106 S. Ct. 925, 932 (1986).

As an alternative basis for challenging section 14–60–140(d) of the Chicago Municipal Code, Pooh Bah contends that the ordinance is overbroad. Overbreadth is a judicially created doctrine which recognizes an exception to the established principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the court. Under the doctrine, a party being prosecuted for speech or expressive conduct may challenge the law on its face if it reaches protected expression, even when that person's own activities are not protected by the first amendment. The reason for this special rule in first amendment cases is apparent: an overbroad statute might serve to chill protected speech. A person contemplating protected activity might be deterred by the fear of prosecution. The doctrine reflects the conclusion that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted. *Bates v. State Bar of Arizona*, 433 U.S. 350, 380, 53 L. Ed. 2d 810, 833-34, 97 S. Ct. 2691, 2707 (1977).

The doctrine's tolerance is not unbounded. "[T]here comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law–particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.' " *Virginia v. Hicks*, 539 U.S. 113, 119, 156 L. Ed. 2d 148, 157, 123 S. Ct. 2191, 2197 (2003), quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 37 L. Ed. 2d 830, 842, 93 S. Ct. 2908, 2917 (1973). Like most exceptions to established principles, the doctrine must be carefully tied to the circumstances in which facial invalidation of a statute is truly warranted. *New York v. Ferber*, 458 U.S. 747, 769, 73 L. Ed. 2d 1113, 1130, 102 S. Ct. 3348, 3361 (1982). Its concern with "chilling" protected speech attenuates as the otherwise unprotected behavior that it forbids the state to sanction moves from pure speech toward conduct and that conduct, even if expressive, falls within the scope of otherwise valid laws. *Los Angeles Police Department v. United Reporting Publishing Corp.*, 528 U.S.

32, 40, 145 L. Ed. 2d 451, 460, 120 S. Ct. 483, 489 (1999), quoting *Ferber*, 458 U.S. at 770, 73 L. Ed. 2d at 1131, 102 S. Ct. at 3361, quoting *Broadrick*, 413 U.S. at 615, 37 L. Ed. 2d at 842, 93 S. Ct. at 2917.

Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct would otherwise be punishable despite the first amendment, the Court has characterized the overbreadth doctrine as "strong medicine" and employed it with hesitation, and only as a last resort. *New York v. Ferber*, 485 U.S. at 769, 73 L. Ed. 2d at 1130, 102 S. Ct. at 3361. Where, as here, conduct and not merely speech is involved, the overbreadth of the statute must be not only real, but substantial as well, judged in relation to the statute's plainly legitimate sweep. "We will not topple a statute," the United States Supreme Court has held, "merely because we can conceive of a few impermissible applications." *Massachusetts v. Oakes*, 491 U.S. 576, 595, 105 L. Ed. 2d 493, 509, 109 S. Ct. 2633, 2644 (1989). The claimant challenging the law as being unconstitutionally overbroad bears the burden of demonstrating, " 'from the text of [the law] and from actual fact,' " that substantial overbreadth exists. *Virginia v. Hicks*, 539 U.S. at 122, 156 L. Ed. 2d at 159, 123 S. Ct. at 2198, quoting *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 14, 101 L. Ed 2d 1, 17, 108 S. Ct. 2225, 2234 (1988).

More than 50 years after its inception, first amendment overbreadth doctrine remains little understood. R. Fallon, *Making Sense of Overbreadth*, 100 Yale L.J. 853 (1991). Courts and litigants sometimes fail to heed the requirement (see *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799-800, 80 L. Ed. 2d 772, 783, 104 S. Ct. 2118, 2126 (1984)) that a statute's overbreadth be both real and substantial. An example of such a lapse appears in *Eggert Group, L.L.C. v. Town of Harrison*, 372 F. Supp. 1123, 1137 (E.D. Wis. 2005). In invalidating as overbroad an ordinance similar to the one at issue here prohibiting nude dancing in establishments licensed to serve alcohol, a federal magistrate accepted the strip club's contention that the law would prevent the La Leche League from conducting a demonstration of how to breast feed properly. Although Dr. Jack Newman, member of the La Leche League International Health Advisory Council, has been quoted as stating that "[r]easonable alcohol intake [by nursing mothers] should not

be discouraged at all" (see www.lalecheleague.org/FAQ/alcohol.html), we think it unlikely to the point of absurdity that a La Leche League chapter would consider holding an educational meeting about nursing techniques for new mothers in a bar, especially considering that mothers typically bring their new babies and sometimes the babies' siblings to those meetings. Moreover, even if a La Leche League meeting were held in a bar, it is by no means obvious that the women's breast feeding would run afoul of the law. Contrary to the magistrate's apparent belief, the process of nursing a baby does not necessarily require exposure of the mother's breast to public view.

The magistrate in the same case also thought the law was overbroad because "certain all-female educational demonstrations for all-female audiences would be prohibited" at establishments licensed to sell liquor. What the magistrate had in mind here eludes us completely. Are there women who want to conduct educational seminars in bars where the program entails exposing their breasts or genitals or engaging in real or simulated sexual contact, which is the kind of conduct they would have to undertake to trigger the law's prohibitions?[15] Perhaps, but no concrete examples were noted or even hinted at. Rather than being drawn from actual fact, the magistrate's example seems completely made up. In our view and under the standards articulated by the United States Supreme Court, extreme and unfounded hypotheticals of this kind are wholly inadequate to establish that a law is overbroad.

With these thoughts in mind, we believe, as the appellate court did, that Pooh Bah failed to meet its burden of demonstrating that section 4–60–140(d) of the Chicago Municipal Code suffers from substantial overbreadth. The club's contention is that the ordinance suffers from overbreadth because its prohibitions would apply to nude

---

[15]Considering the type of conduct addressed by the ordinance, the "all-female" demonstrations for "all-female" audiences described by the magistrate evoke images of a Roman bacchanalia rather than a serious educational program. The authority to restrict such "bacchanalian revelries," the United States Supreme Court has affirmed, is within the inherent police power of the state. *44 Liquormart*, 517 U.S. at 515, 134 L. Ed. 2d at 735, 116 S. Ct. at 1514.

and seminude performances at any venue licensed to sell alcohol, including those which feature legitimate theater and country clubs where swim meets and water shows take place, and the City has not shown that the secondary effects to which the ordinance is directed would flow from such performances. This argument is untenable. As a preliminary matter, we cannot imagine and Pooh Bah has not explained what kind of country club water shows it has in mind. If country clubs are presenting water shows featuring nude or seminude female performers, and Pooh Bah has presented nothing to substantiate that such shows have been held or even planned for Chicago or anywhere else, the incidence of such performances is surely small. Any overbreadth would therefore be insignificant when compared to the plainly legitimate reach of the ordinance. The swim meet hypothetical is also unpersuasive. By its terms, the ordinance pertains only to "employees," "entertainers," or "patrons" engaged in "live act[s], demonstration[s], dance[s], or exibition[s]." Giving those terms their plain and commonly understood meaning, the ordinance could have no possible application to racers in a swimming competition.[16]

With respect to the example involving venues offering legitimate theater, the City observes, as it did below, that under its liquor licensing ordinances, the "premises" for which it issues licenses consist of the enclosed location where the alcohol is stored or displayed. That definition embraces the stage and seating areas at Pooh Bah's club, but would not include the stage and seating areas in a normal theater. The City does not issue licenses that cover stage and seating areas in such theaters. By local ordinance, the sale of alcohol in theaters is confined to the lobby area and limited to one hour before the performance and during the intermission. Section 14–60–140(d) of the Municipal Code is therefore inapplicable to stage performances at conventional theaters in the City.

---

[16]While we do not purport to be experts on competitive sports gear, we further point out something of which anyone who has watched the Summer Olympics is aware. The outfits typically worn by competitive female swimmers provide considerably more coverage than the City requires of strippers who perform where alcohol is served.

In any event, we note again that the ordinance does not actually even forbid any speech or expressive conduct. Nude or seminude dancing is perfectly lawful in the City. This ordinance merely prohibits such performances from being combined with the sale and consumption of alcohol. Under the law, the combination of live nude or seminude dancing and the sale and consumption of alcohol is not allowed anywhere, regardless of the quality, character, or content of the performance. In this respect, the expansiveness of the ordinance is a virtue, rather than a vice, for it is evidence that the ordinance does not discriminate against a particular message or point of view. See *Hill v. Colorado*, 530 U.S. 703, 731, 147 L. Ed. 2d 597, 621, 120 S. Ct. 2480, 2497 (2000). Moreover, because the first amendment does not entitle a licensed liquor establishment, its performers or its patrons to have alcohol available during live nude or seminude performances (*Ben's Bar*, 316 F.3d at 727; *Sammy's of Mobile*, 140 F.3d at 999 ("we are unaware of any constitutional right to drink while watching nude dancing")), enforcement of the ordinance at other types of establishments licensed to serve alcohol by the drink would no more trench on their first amendment rights than it does on the first amendment rights claimed by Pooh Bah. Like the conduct at issue here, the conduct at those other establishments would be encompassed within the ordinance's legitimate sweep. The ordinance is therefore not overly broad. *Hill v. Colorado*, 530 U.S. at 732, 147 L. Ed. 2d at 621, 120 S. Ct. at 2498.[17]

Pooh Bah next argues that section 14–60–140(d) of the Municipal Code violates the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV) because it is too vague. A statute can be impermissibly vague for either of two independent reasons: (1) if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, or (2) if it authorizes or even encourages arbitrary and discriminatory

---

[17]By its terms and as applied by the City of Chicago, the ordinance pertains only to acts, demonstrations, dances, or exhibitions which are "live." It therefore has no possible application to movies, television broadcasts or displays of artwork. Pooh Bah makes no argument to the contrary. Accordingly, we need not consider such activities in assessing the reach of the ordinance.

enforcement. *Hill v. Colorado*, 530 U.S. at 732, 147 L. Ed. 2d at 621, 120 S. Ct. at 2498.

A party may raise a vagueness challenge by arguing either that a statute is vague as applied to the facts at hand, or that a statute is void on its face. The first type of challenge, as its name suggests, evaluates a statute in the context of the specific circumstances in which it was applied to the litigant who contests its validity. If the litigant's own conduct falls squarely within the statute's prohibitions, he cannot complain of the vagueness of the law as applied to others. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 71 L. Ed. 2d 362, 369, 102 S. Ct. 1186, 1191 (1982).

With respect to the second type of challenge, a statute is normally not unconstitutional on its face unless it provides no standard of conduct at all, *i.e.*, the ambiguity is so pervasive that it is incapable of any valid application. *People v. Fabing*, 143 Ill. 2d 48, 55 (1991), quoting *Steffel v. Thompson*, 415 U.S. 452, 474, 39 L. Ed. 2d 505, 523, 94 S. Ct. 1209, 1223 (1974). Facial challenges to legislation are generally disfavored. *National Endowment for the Arts v. Finley*, 524 U.S. 569, 580, 141 L. Ed. 2d 500, 511, 118 S. Ct. 2168, 2175 (1998), quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223, 107 L. Ed. 2d 603, 616, 110 S. Ct. 596, 603 (1990). The courts have held, however, that when a law threatens to inhibit the exercise of constitutionally protected rights such as those protected under the first amendment, the Constitution demands that a more stringent vagueness test be applied. In such a scenario, a statute is void for vagueness if it reaches a substantial amount of constitutionally protected conduct. *United States v. Marzook*, 383 F. Supp. 2d 1056 (N.D. Ill. 2005).

Because of the requirement that a statute must reach a substantial amount of constitutionally protected speech, the facial vagueness and overbreadth analyses are cognate. *Record Head Corp. v. Sachen*, 682 F.2d 672, 674 (7th Cir. 1982). For reasons discussed in connection with Pooh Bah's overbreadth claim, the club failed to establish that section 14–60–140(d) of the Municipal Code reaches a substantial amount of speech or expressive conduct protected by the first amendment. As a result, just as the club cannot assert a valid overbreadth claim, it likewise cannot attack the ordinance on the grounds that it is unconstitutionally vague on its face.

Pooh Bah's vagueness claim can succeed, if at all, only if the club can establish that the ordinance is vague as applied. While not clearly defined, Pooh Bah's vagueness argument appears to rest on the first of the two reasons on which vagueness challenges may be based, namely, that persons of ordinary intelligence could only guess at its meaning. The particular terms or phrases with which Pooh Bah took issue below were "buttocks," "any portion of the female breast at or below the areola thereof," "shall be considered exposed to public view if it is uncovered or is less than completely and opaquely covered," and "any device, costume or covering which gives the appearance of or simulates the genitals, pubic hair, buttocks, perineum, anal region or pubic hair region." The appellate court rejected Pooh Bah's arguments regarding these provisions, finding that the meaning of the challenged language was apparent and perfectly intelligible. In our court, Pooh Bah has narrowed it focus. Its arguments now center on the meaning of "buttocks," "any portion of the female breast at or below the areola thereof," and "less than completely and opaquely covered."

The tests for assessing whether a law is vague are not capable of mechanistic application. Business regulations, for example, may be less precise than other forms of legislation because the entities affected by such regulations are more apt to know where the lines are drawn and more able to obtain clarification through inquiry or administrative proceedings. Civil legislation can be vaguer than criminal laws because the consequences of imprecision are qualitatively less severe. *Record Head Corp. v. Sachen*, 682 F.2d at 674. In any context, moreover, there are limits to the degree of precision attainable by the English language. The United States Supreme Court has therefore recognized that " 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.' " *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006), quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794, 105 L. Ed. 2d 661, 677, 109 S. Ct. 2746, 2755 (1989). We must also remain mindful that when judging the constitutionality of a rule or statute, common sense cannot and should not be suspended. *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006).

The clarity of the term "buttocks" has frequently been addressed by courts in the context of challenges to laws and regulations

pertaining to nudity. See *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995); *Dodger's Bar & Grill v. Johnson County Board of County Commissioners*, 32 F.3d 1436, 1444 (10th Cir. 1994); *Geaneas v. Willets*, 911 F.2d 579, 586-87 (11th Cir. 1990); *Wayside Restaurant, Inc. v. Virginia Beach*, 215 Va. 231, 236, 208 S.E.2d 51, 55 (1974). These courts have consistently found that the term can be understood by persons of ordinary intelligence. We see no possible basis for reaching a contrary conclusion in this case. We likewise see no grounds for holding that the phrase "less than completely and opaquely covered" is not sufficiently clear to provide a person of ordinary intelligence a reasonable opportunity to understand what it requires. Moreover, and more importantly, even if there might be some circumstances in which the meaning and applicability of these terms might be uncertain, such circumstances are not present here. The T-bars worn by Pooh Bah dancers covered the area between their buttocks, including the anus, but left the buttocks themselves completely uncovered. Their conduct thus fell squarely and unambiguously within the ordinance's prohibitions. As a result, Pooh Bah will not be heard to complain that the law is vague as applied to its dancers.

The same is true of that portion of the ordinance prohibiting the exposure of "any portion of the female breast at or below the areola thereof." Pooh Bah's policy required only that dancers apply a latex and makeup covering to their nipples, areolas and triangular areas extending below the areolas in the frontal portion of each breast. Evidence was presented that the actual makeup and latex covering did not even cover that much. From the photographic and video exhibits included in the record and the testimony of the investigating police officers, there is no indication of any covering beyond the nipples and areolas. Even those areas would appear totally nude except for the fact that their natural color was obscured. Whatever the actual coverage, however, there is no dispute that it did not extend to the lateral portions of the breasts below the tops of the areolas. The sides of the dancers' breasts were left completely uncovered. Courts considering similar laws have held that persons of ordinary intelligence could reasonably be expected to understand that the portion of the female breast at or below the areola would include the entire portion of the female breast at or below the areola, including the sides. See

*City of Daytona Beach v. Del Percio*, 476 So. 2d 197, 200 (Fla. 1985) (language refers to portion of breast directly or laterally below the top of the areola); *State v. Fantasia Restaurant & Lounge, Inc.*, Nos. 0112001060, 0109002426, 0112000958 cons., slip op. at 10 (Del. Super. Ct. 2004) (term refers to "entire area of the entire breast below the top of the areola, not simply the strip of flesh the width of the areola below the top of the areola"). That is precisely how the ordinance was understood by regulatory authorities in the City, and we agree that it is how persons of ordinary intelligence would understand it. Pooh Bah and its dancers therefore cannot complain that they were not given fair notice that their latex and makeup practices were insufficient to meet the requirements of section 14–60–140(d) of the Municipal Code. Application of the ordinance to them does not violate their rights to due process under the fourteenth amendment.

Pooh Bah's final contention is that even if section 14–60–140(d) of the Municipal Code does not contravene the first and fourteenth amendments to the United States Constitution, we should declare it invalid under the "freedom of speech" provision of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §4). That provision guarantees that "[a]ll persons may speak, write and publish freely, being responsible for the abuse of that liberty." Ill. Const. 1970, art. I, §4. The relationship between article I, section 4, of the Illinois Constitution and the first amendment to the United States Constitution was discussed by this court in *People v. DiGuida*, 152 Ill. 2d 104 (1992). After reviewing the history of the provision and the discussion of its terms at the 1970 Constitutional Convention, we concluded that the framers recognized that the Illinois Constitution may provide greater protection to free speech than does its federal counterpart. *People v. DiGuida*, 152 Ill. 2d at 121. We therefore rejected "any contention that free speech rights under the Illinois Constitution are in all circumstances limited to those afforded by the Federal Constitution." *People v. DiGuida*, 152 Ill. 2d at 122. This, however, does not end our inquiry.

That article I, section 4, of our constitution may afford greater protection than the first amendment in some circumstances does not mean that greater protection is afforded in every context. See *Ino Ino, Inc. v. City of Bellevue*, 132 Wash. 2d 103, 115, 937 P.2d 154, 162

(1997). Construing a state constitutional provision nearly identical to ours, the Washington Supreme Court noted that the provision, by its terms, referred only to speaking, writing and publishing. No mention was made of expressive conduct. The court recognized that the provision had been found to warrant greater protection than the first amendment for speech, both spoken and written, in some contexts. In the absence of language relating to expressive conduct, however, the court ruled that the text of the state constitution did not justify extending greater protection to nude and seminude dancing at adult cabarets than would be afforded by the first amendment. *Ino Ino, Inc. v. City of Bellevue*, 132 Wash. 2d at 117, 937 P.2d at 163.

Courts in other jurisdictions applying state constitutional provisions which are similar (and in some cases nearly identical) to article I, section 4, of the Illinois Constitution of 1970 have likewise held that their state constitutions provide no greater protection to nude or seminude dancing than is conferred by the first amendment. See *Empress Adult Video & Bookstore v. City of Tucson*, 204 Ariz. 50, 62, 59 P.3d 814, 826 (App. 2002) (collecting various cases); *Junction 615, Inc. v. Liquor Control Comm'n*, 135 Ohio App. 3d 33, 41, 732 N.E.2d 1025, 1031 (1999) (state restriction on public nudity in liquor establishments upheld on grounds that it "did not restrict First Amendment rights any more than necessary" and the "free speech guarantees accorded by the Ohio Constitution are no broader than the First Amendment"); *Ranch House, Inc. v. City of Anniston*, 678 So. 2d 745, 746-47 (Ala. 1996) (state constitution's free speech protections did not invalidate local ordinance prohibiting nudity or partial nudity in businesses that sell or dispense alcohol); *Knudtson v. City of Coates*, 519 N.W.2d 166, 169-70 (Minn. 1994) (prohibition against nude dancing in establishments licensed to sell alcohol upheld against state constitutional challenge); *S.J.T., Inc. v. Richmond County*, 263 Ga. 267, 269, 430 S.E.2d 726, 728-29 (1993) (same); *City of Billings v. Laedeke*, 247 Mont. 151, 157-58, 805 P.2d 1348, 1352 (1991) (same); *City of Daytona Beach v. Del Percio*, 476 So. 2d 197, 203-04 (Fla. 1985) (similar).[18] Although the Supreme Judicial

---

[18]In *Bellanca v. New York State Liquor Authority*, 54 N.Y.2d 228, 429 N.E.2d 765, 445 N.Y.S.2d 87 (1981), a case cited by Pooh Bah, New York's highest court held, on remand from the United States Supreme Court

Court of Massachusetts reached a contrary result in *Commonwealth v. Sees*, 374 Mass. 532, 373 N.E.2d 1151 (1978), we find the majority view more persuasive. Consistent with that view, we find no basis for concluding that article I, section 4, of the Illinois Constitution affords greater protection to nude and seminude dancing in establishments licensed to sell alcohol than is provided by the federal constitution. Pooh Bah's argument that section 14–60–140(d) of the Chicago Municipal Code is invalid under article I, section 4, of the Illinois Constitution is therefore rejected.

Because section 14–60–140(d) of the Municipal Code does not violate either the United States or the Illinois Constitution, the circuit court erred in concluding that the ordinance could not serve as the predicate for revoking Pooh Bah's liquor license revocation or enjoining its operation on the grounds that it constituted a public nuisance. The appellate court therefore acted properly in reversing the circuit court's judgment and remanding for further proceedings. The City urges us to dispense with the remand and enter judgment in its favor now. This we decline to do. Because the circuit court's judgment turned on the constitutionality the ordinance, the circuit court did not reach the non-constitutional issues raised by Pooh Bah on administrative review of its liquor license, nor did it fully resolve the merits of the City's claim for injunctive relief. We believe that those matters should be addressed by the circuit court in the first instance. We will not supplant its function. Our purpose on this interlocutory appeal was to finally determine the relevant constitutional questions. That has been done.

Pooh Bah argues that on remand it should be permitted to present additional evidence on the question of whether the ordinance actually creates the secondary effects claimed by the City. This argument is

---

in *New York State Liquor Authority v. Bellanca*, 452 U.S. 714, 69 L. Ed. 2d 357, 101 S. Ct. 2599 (1981), that a liquor control statute banning topless dancing in premises licensed to sell alcohol did violate the state constitution's guarantee of freedom of expression. In reaching that result, however, the court specifically noted that it was not reaching the question of whether the state constitution's free speech guarantee was broader than the guarantee of the first amendment to the United States Constitution. *Bellanca*, 54 N.Y.2d at 234, 429 N.E.2d at 768, 445 N.Y.S.2d at 90.

untenable. The sole reason Pooh Bah seeks to present such evidence is to renew and bolster its contention that the ordinance violates constitutional standards. For purposes of this appeal, however, the constitutionality of the ordinance is no longer subject to dispute. Our holding that the ordinance does not violate the United States or Illinois constitution is conclusive of the issue and shall be binding on the parties and on the circuit court on remand.

For the foregoing reasons, the judgment of the appellate court, reversing the judgment of the circuit court and remanding the cause, is affirmed.

*Appellate court judgment affirmed.*

JUSTICE BURKE took no part in the consideration or decision of this case.

## Dissent Upon Denial of Rehearing

JUSTICE FREEMAN, dissenting:

I initially joined the majority opinion in this case. I believe, however, that many of the points raised by Pooh Bah in its petition for rehearing merits this court's further consideration. Specifically, I am concerned, as noted by Pooh Bah in its rehearing petition, that this court's opinion "ignores" several substantive first amendment issues, violates the "constitutionally required procedures for intermediate scrutiny *** resulting in a denial of due process to Pooh Bah," and contains "errors, omissions and distortions of the record." Because I believe that this case deserves further reflection, and because this court has not seen fit to use rehearing as a means of addressing these points, I can no longer join the majority in its opinion. Accordingly, I dissent from the court's denial of rehearing in this cause.

First, as Pooh Bah notes in its petition for rehearing, the court's opinion in the matter at bar completely overlooks Pooh Bah's argument that strict scrutiny analysis should be applied to section 4–60–140(d) of the Chicago Municipal Code (the "coverage ordinance"). In its written submissions to this court, Pooh Bah

strongly relied upon two decisions from the United States Supreme Court in support of its assertion that strict scrutiny is applicable to the ordinance at issue in this case: *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 146 L. Ed. 2d 865, 120 S. Ct. 1878 (2000), and *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 152 L. Ed. 2d 403, 122 S. Ct. 1389 (2002). Pooh Bah asserted that the challenged ordinance is content-related, on the basis that the law applies solely to erotic entertainment and because its effect and purpose is to limit erotic expression by regulating the body coverage on erotic performers. According to Pooh Bah, the City's justification for the ordinance rests in part on the alleged *primary* effect of the erotic expression on the audience, *i.e.*, that the combination of alcohol and seminude dancing prompts viewing-and-drinking patrons to commit crime or become victims of crime when they leave the club. Pooh Bah noted that this is the direct opposite of a content-neutral justification. Therefore, Pooh Bah reasoned, because the challenged ordinance was not sought to be justified solely by content-neutral reasons–but also by the putative primary effects of the combination of alcohol and erotic dancing on the viewers–the City's proffered justification requires strict scrutiny review.

As stated, in support of this proposition, Pooh Bah relied upon the *Playboy* and *Ashcroft* decisions, in which the United States Supreme Court struck down on first amendment grounds federal statutes which attempted to regulate sexually oriented cable television programming and child pornography. See *Playboy,* 529 U.S. at 826-27, 146 L. Ed. 2d at 887-88, 120 S. Ct. at 1893 (provision of the Telecommunication Act which attempted to prevent "signal bleed" by requiring cable operators either to scramble sexually explicit channels in full or limit programming on such channels to certain hours violated first amendment); *Ashcroft*, 535 U.S. at 258, 152 L. Ed. 2d at 426, 122 S. Ct. at 1406 (certain provisions of the Child Pornography Prevention Act of 1996–including a ban on virtual child pornography–found to violate the first amendment). In both instances, the Court concluded that the challenged statutes were subject to strict scrutiny analysis because they had a content-related intent or purpose. *Playboy*, 529 U.S. at 811-13, 146 L. Ed. 2d at 878-79, 120 S. Ct. at 1885-86; *Ashcroft*, 535 U.S. at 253-54, 152 L. Ed. 2d at 422-23, 122 S. Ct. at 1403. In its petition for rehearing before this court, Pooh Bah

contends that this court's opinion should, at the very least, "distinguish *Playboy* and *Ashcroft* and explain why non-obscene Gentlemen's Clubs in Illinois get less constitutional protection than graphic sexual activities shown on cable TV or than child molesters under the First Amendment." I agree.

The opinion of this court overlooks both of these recent United States Supreme Court free speech cases on which the defendants strongly rely for their strict scrutiny argument. Rather than directly address a central argument debated at length by the parties in this case and engage in a thoughtful analysis of these contentions, the court simply relegates this important debate to a brief footnote in the opinion. In footnote 12 of this court's opinion (slip op. at 20 n.12), this court notes, in passing, that "Pooh Bah argues that the strict scrutiny standard should govern this case." The footnote further states that "[f]or the reasons set forth later in this opinion, Pooh Bah is incorrect." This is the extent of the discussion the court provides with respect to the strict scrutiny argument raised in this appeal. The court rejects Pooh Bah's strict scrutiny argument without further direct analysis or explanation, despite the fact that, in its written submissions to this court, the City justified its challenged ordinance, in part, on the basis of the claimed effect of the expression–erotic seminaked dancing–on the club's patrons, in support of the theory that the patrons then are more likely to commit or be victims of crime. Accordingly, by virtue of this argument, the City itself has invited application of the line of cases culminating in the *Playboy* and *Ashcroft* decisions, which apply the higher strict scrutiny standard to laws directed at the impact of speech on its listeners or watchers.

Furthermore, the court rejects Pooh Bah's assertions that strict scrutiny applies in this case despite the fact that in its opinion the court itself resorts to anecdotal evidence of the supposed *primary* effects of the combination of alcohol and live seminaked dancing on its viewers, noting, *e.g.*, the "customer who exposed himself and began masturbating in the middle of the club." Slip op. at 33. In addition, the court discusses the testimony of the City's expert, Dr. Kodish, which focused upon the psychiatric effects on males resulting from the combination of alcohol and sexual stimulation. According to Dr. Kodish, this combination produces an effect " 'associated with an increase in violent sexual acting out, acts of criminal behavior.' " Slip

op. at 29. Because this court justifies the City's coverage ordinance in part by the supposed effects of the regulated conduct on its audience, this court's own analysis triggers a discussion of whether strict scrutiny review is applicable in this case.

The court sidesteps any discussion of strict scrutiny review by relying heavily upon the decision of the United States Court of Appeals for the Seventh Circuit in *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702 (7th Cir. 2003). That decision applies an intermediate scrutiny analysis to the review of a local ordinance regulating "sexually oriented businesses," without detailed consideration as to whether or not strict scrutiny is triggered by the challenged law or the justification advanced for that law. However, I note that, in *Ben's Bar*, the applicable level of scrutiny was not at issue and that the parties agreed that intermediate scrutiny was the applicable standard for first amendment review. No party in that case advocated for strict scrutiny analysis, and, therefore, it was appropriate for the court in that case not to address the issue of which standard of review applied. In contrast, in the matter before us, Pooh Bah has vigorously argued from the moment it filed its petition for leave to appeal with this court that strict scrutiny review applies. This court's opinion, therefore, should address Pooh Bah's arguments with respect to the application of strict scrutiny analysis and either distinguish or apply the *Ashcroft* and *Playboy* decisions–two decisions which remain conspicuously absent from this court's opinion. In its opinion, this court evades the strict scrutiny argument and automatically applies intermediate scrutiny simply because a governmental body claims that the purpose of the challenged ordinance is to attack alleged negative secondary effects.

I am deeply troubled by the court's out-of-hand dismissal of Pooh Bah's strict scrutiny argument for several additional reasons. First, such conduct on the part of this court denies the parties to this action the reassurance that we have carefully considered and deliberated their arguments. What message does this court send to litigants when it does not even bother to address the central arguments raised in their appeals, especially when they are issues of constitutional magnitude? I venture to say that it creates the perception that this court has predetermined the outcome of the appeal and does not deem it necessary to bother with arguments that may cut in the opposite

direction. In addition, by failing to address and fully analyze an issue such as whether strict scrutiny applies to the ordinance challenged in this case, this court fails to provide the bench and bar with the guidance needed to deal with similar issues in future cases. Indeed, the legal community "rel[ies] on our opinions to map the evolving course of law." *People v. Jung*, 192 Ill. 2d 1, 17 (2000) (McMorrow, J., specially concurring, joined by Miller and Freeman, JJ.). This court has utterly failed to carry out this mission in the instant cause.

In its petition for rehearing, Pooh Bah also takes issue with this court with respect to several aspects of its intermediate scrutiny review of the City's coverage ordinance. In its opinion, the court uses the following test from the *Ben's Bar* decision to determine whether the challenged coverage ordinance withstands intermediate scrutiny review. Under this test, a challenged law is constitutional if:

> " '(1) the State is regulating pursuant to a legitimate governmental power [citation]; (2) the regulation does not completely prohibit adult entertainment [citation]; (3) the regulation is aimed not at the suppression of expression, but rather at combating the negative secondary effects caused by adult entertainment establishments [citation]; and (4) the regulation is designed to serve a substantial government interest, narrowly tailored, and reasonable alternative avenues of communication remain available [citation]; *or*, alternatively, the regulation furthers an important or substantial government interest and the restriction on expressive conduct is no greater than is essential in furtherance of that interest. [Citation.]' (Emphasis in original.) *Ben's Bar*, 316 F.3d at 722." Slip op. at 19-20.

I agree with my colleagues that the weight of precedent requires this court to uphold the City's coverage ordinance against a facial challenge of its constitutionality. It is well settled that local governments can ban nudity itself, including partial nudity such as topless entertainment. See, *e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 115 L. Ed. 2d 504, 111 S. Ct. 2456 (1991). I am satisfied that the coverage ordinance falls within the ambit of decisions that have upheld government regulations of sexually oriented businesses against facial challenges based upon secondary-effects justifications.

However, Pooh Bah argues on rehearing that this court in its opinion has completely overlooked its argument that the City's coverage ordinance is violative of the first amendment *as applied* to Pooh Bah's specific factual situation. I agree with Pooh Bah, and disagree with the court's conclusion that the first amendment analysis is appropriately ended in this case with its holding that the coverage ordinance withstands a facial challenge. The court declines to fully address Pooh Bah's as-applied challenge to this ordinance and disregards the incompleteness of the proceedings below with respect to that challenge.

The first of Pooh Bah's specific points in its petition for rehearing with respect to this court's intermediate scrutiny analysis is its contention that this court's opinion violates "the constitutionally required procedures for intermediate scrutiny review," thereby "resulting in a denial of due process to Pooh Bah." Pooh Bah takes issue with this court's denying it an opportunity to complete its attack on the City's secondary-effects justification for the challenged ordinance on remand. Pooh Bah notes that this court denies it this opportunity not only despite the fact that the circuit court had entered a directed verdict in Pooh Bah's favor finding that the ordinance was unconstitutional after the City had rested its case in chief and before Pooh Bah had completed presentation of its own evidence in rebuttal, but also despite the fact that the circuit court specifically reserved to Pooh Bah the right to present additional evidence in the event that the court's decision was subsequently overturned on appeal.

The record reflects that the circuit court ruled in Pooh Bah's favor and against the City on January 18, 2001. On that date, the circuit court judge filed a very detailed memorandum opinion and order. However, on May 3, 2001, the circuit court judge–with the agreement of the parties–amended the January 18, 2001, memorandum opinion and order *nunc pro tunc* by entering a series of three additional orders. One order entered on May 3, 2001, was entitled "Partial Judgment Order," and this order notes that the cases had been before the circuit court on "Pooh Bah's motions for directed findings and for judgment at the conclusion of the City's case-in-chief." The order further recounts that the parties had entered into a "stipulation submitting the cases for a ruling on the current record," and that the circuit court's ruling on Pooh Bah's directed verdict motion was "subject to

reservations by all parties of their respective rights to present additional evidence if these motions are not finally dispositive." The order incorporates the circuit court's prior January 18, 2001, memorandum opinion and order, as well as prior rulings it rendered on August 21, 2000, and for the reasons stated in those prior decisions, granted Pooh Bah's motion for directed finding and for judgment against the City. In the May 3 order, the circuit court explicitly "retain[ed] jurisdiction," *inter alia*, "over the remaining trial of these matters, if any of the judgments herein shall be reversed or vacated." The court's order also stated that "Pooh Bah has reserved its right to present additional evidence in opposition to Counts I-V and in support of its affirmative defenses and amended counterclaims in No. 99 CH 9682, and in support of its claims in No. 93 CH 4559, if the judgments in this order are not affirmed in a final and non-appealable order."

Thus, the record reflects that the circuit court entered judgment for Pooh Bah against the City on a motion for entry of a directed verdict and not on a final record at the end of trial. Pooh Bah was midstream in its defense case and was not finished in attacking the City's *prima facie* case in justification of the coverage ordinance when the circuit court ruled on Pooh Bah's already pending motion for directed verdict. Based upon this procedural posture, the circuit court explicitly reserved the "right" of Pooh Bah to present additional evidence on remand in the event of a reversal and did not limit the scope of such evidence. In its opinion, this court mentions the entry of the May 3, 2001, orders in passing (slip op. at 11), but does so in a general and vague manner, except for specifically noting in footnote 9 of the opinion that one of the agreed orders "reserved to the City the right to present additional evidence regarding the amount of fines that could be imposed by Pooh Bah in the event the City prevailed on the merits." Slip op. at 11 n.9. I question why this court feels compelled to set forth with specificity that the circuit court order provides that the City may present additional evidence with respect to the fines to be levied against Pooh Bah on remand, but remains completely silent with respect to the fact that the order also granted to Pooh Bah "its right to present additional evidence" regarding issues which were cut short by the court as a result of its grant of Pooh Bah's motion for directed verdict. I attach the circuit court's May 3, 2001, "Partial

-54-

Judgment Order" as an appendix to this dissenting opinion as the best evidence of the intent of the parties and the circuit court with respect to this issue.

In addition, I note that the intermediate scrutiny analysis of the validity of the City's secondary-effects justification in support of the coverage ordinance is a *fact-based* assessment, as the United States Supreme Court has repeatedly noted, particularly in its most recent decisions. See *City of Erie v. Pap's A.M.*, 529 U.S. 277, 146 L. Ed. 2d 265, 120 S. Ct. 1382 (2000); *City of Los Angeles v. Alameda Books*, *Inc.*, 535 U.S. 425, 152 L. Ed. 2d 670, 122 S. Ct. 1728 (2002); see also *R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402 (7th Cir. 2004). In *Alameda Books*, the Court described the proper analytical framework for this inquiry:

> "We held [in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 89 L. Ed. 2d 29, 106 S. Ct. 925 (1986)] that a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest. [Citations.] This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Alameda Books*, 535 U.S. at 438-39, 152 L. Ed. 2d at 683, 122 S. Ct. at 1736.

In their opinion, my colleagues do not address this three-part evidentiary procedure set forth by the United States Supreme Court, which requires: (1) justification for the ordinance by the government; (2) challenge and dispute of the ordinance by the challenger; and (3) rebuttal by the government. Instead, they take Pooh Bah to task for requesting that this court recognize its right–under the *Alameda*

decision and the May 3, 2001, circuit court order–to complete presentation of its evidence at trial:

> "The sole reason Pooh Bah seeks to present [additional evidence on the question of whether the ordinance actually creates the secondary effects claimed by the City] is to renew and bolster its contention that the ordinance violates constitutional standards. For purposes of this appeal, however, the constitutionally of the ordinance is no longer subject to dispute. Our holding that the ordinance does not violate the United States or Illinois constitution is conclusive of the issue and shall be binding on the parties and on the circuit court on remand." Slip op. at 48.

I disagree. This court's opinion fails to explain why, since the circuit court judge's directed findings on a half-completed record are now reversed, the rebuttal cases of both the challengers and the government should be cut off, not only despite the fact that the constitutional procedures mandated for intermediate scrutiny review require that both sides have these opportunities, but also despite the fact that the circuit court's May 3, 2001, order explicitly reserved to Pooh Bah this right in light of the procedural posture of the case at the time that order was entered.[19]

In addition, this court's opinion reverses a fact-based decision of the trial court and, in doing so, reweighs the sufficiency and credibility of the City's "justification" evidence to conclude that the City has adequately established that the coverage ordinance was enacted to combat secondary effects. As a general matter, it is not for this court,

---

[19]As Pooh Bah states in its petition for rehearing:

> "[T]he opinion prematurely makes a 'final' determination of the constitutionality of the coverage ordinance on the fact-sensitive intermediate scrutiny review–even though the most that can properly be determined on appeal on that review (by reversing the trial judge's findings) is that the City made a *prima facie* case to justify the ordinance. Particularly on the as-applied challenge, the case was not over. But the opinion improperly cuts off the attack on the City's proferred secondary effects justifications, thus barring this litigant from *ever* finishing its constitutional attack on the ordinance." (Emphasis in original.)

as a court of review, to substitute its judgment for that of the trial court on issues of fact, as the trial court judge is in the best position to observe the conduct and demeanor of the parties and the witnesses. *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006). This court's actions are particularly troubling in this case, in light of the following excerpt from the memorandum opinion and order of the circuit court, written after a parade of witnesses were called by the City in support of its secondary-effects justification: "The court finds the record devoid of any proof of the existence of even potentially harmful secondary effects. Indeed, it finds that the City was successful in merely positing the possibility that those secondary effects could hypothetically exist."

Unless this court can say with 100% certainty that, as a *matter of law*, there is no possible further evidence that may cast any doubt on the City's two main theories of justification–patron-generated crime and outside-generated crime–or that might refute those theories, this case should be allowed to play out in the trial court on remand, like any other case where a directed finding is reversed. The court's opinion leads to the conclusion that the majority is unfairly holding Pooh Bah to an unprecedented and heretofore-not-announced standard that mandates a proffer of evidence on appeal to obtain a remand after reversal of a directed finding.

In addition, Pooh Bah also asserts on rehearing that the opinion filed by this court overlooks, as part of its intermediate scrutiny analysis, the issue of multiple, overlapping and cumulative legislative remedies in this case. As the court notes in its opinion, the challenged coverage ordinance was passed by the Chicago city council in 1978. Subsequently, in 1993 the city council passed an anticoncentration adult use zoning ordinance which adopted location and dispersion regulations for adult uses in the city, and which was enacted to combat the same perceived problem as allegedly targeted by the coverage ordinance: the so-called secondary effects of liquor-serving adult-dancing venues.

As early as in its petition for leave to appeal filed with this court, Pooh Bah raised the validity of these overlapping regulations as a central issue for this court's review, and noted that its club complies with the requirements of the later-enacted adult use ordinance. In its petition for leave to appeal, Pooh Bah questioned whether, in the specific factual context of this case, the City must show whether the

coverage ordinance has, or will have, some substantial impact on the targeted secondary effects above and beyond that provided by the subsequent adult use zoning ordinance. Pooh Bah made the point that, if this query is answered in the negative, there is a danger that restrictions on free speech and expression can cumulate, "with the latest legislative 'solution' piled on top of yesterday's solution, and on and on without genuine judicial review of their individual justifications–or lack of justification." The significance of the interplay between these regulatory remedies as applied to Pooh Bah was one of the reasons that this court accepted this appeal for review. However, in its opinion, the court has failed to address this issue, which is relevant in determining the validity of the City's secondary-effects justification.

Along these lines, Pooh Bah also asserts that this court improperly overlooked in its opinion that, as a result of the City's 1993 enactment of the adult use zoning ordinance, Pooh Bah's club is legally mandated to be physically isolated from any other adult venues. According to Pooh Bah's rehearing petition, the court's opinion "ignores the industrial, non-residential character (and associated limited pedestrian traffic patterns) of the Club's area," facts which, in Pooh Bah's view, are "especially pertinent to the as-applied challenge, which the court does not take up in its opinion."

In my view, the facts concerning the physical isolation of Pooh Bah's club are relevant to two issues. First is the general "justification" for the coverage ordinance with respect to incidents of crime in the vicinity of the club generated from outside sources. The City and most of the case law relies heavily on this justification. In addition, this argument was supported by the various "studies" from other cities that the City's expert witnesses described in the circuit court. Pooh Bah, however, countered that most or all of that evidence is based on concentrations of adult businesses or concentrations of liquor establishments. If so, then the absence of concentration in this case is a factor that undermines the relevance of those studies. Indeed, this is one of the obvious disputes in this case that is appropriate for further evidence on remand.

Second, the physical isolation of the club is relevant to Pooh Bah's as-applied challenge to the coverage ordinance based on the later-enacted adult zoning ordinance, which, as stated, mandates physical

separation between adult establishments and which, Pooh Bah claims, has solved any crime-in-the-vicinity problem (based upon the absence of crime in the area). Pooh Bah asserts that this state of affairs requires from the City some additional or different justification for the coverage ordinance beyond the usual anticrime justification. It is my view that the coverage ordinance of the 1970s may be archaic and unnecessary by virtue of the City's own superseding adult use zoning legislation. The City's burden of justifying the older coverage ordinance under the immediate scrutiny analysis should include the burden of demonstrating the marginal need for the older law in addition to the anticoncentration efforts in the newer zoning law. These are points which are completely overlooked by the court in its opinion, and which would be appropriate for further consideration.

In a related argument, Pooh Bah asserts in its petition for rehearing that this court engaged in "clear and plain error" in its consideration of the intermediate scrutiny issues by incorrectly citing the legislative history and preambles of the City's 1993 adult use zoning ordinance as if that were the legislative history and original city council intent of the challenged coverage ordinance, which was enacted 15 years earlier. See slip op. at 24-26. I agree. The findings on which this court's opinion relies focus on the City's justification for enacting the *zoning* restrictions, rather than for the earlier-enacted coverage ordinance. As Pooh Bah states in its rehearing petition, "the opinion erroneously treats the City's announced policies supporting its 1993 adult use *zoning* remedy (which were not addressed to liquor venues) as if it were the original expressed intention for the 1978 'coverage' requirements–which had no preamble or announced intentions other than the Committee Report, which the opinion disregards." (Emphasis in original.)

In sum, with respect to this court's treatment of the intermediate scrutiny issues in this appeal, I agree with Pooh Bah that it is untenable precedent to reserve a directed finding and then not allow the former winner to finish presenting its evidence on remand, especially on an appeal from an injunction hearing without full discovery. As Pooh Bah validly points out in its rehearing petition:

> "Why would any Illinois lawyer now move for (or accept) a directed verdict or finding–which is *now* a waiver of the right to present the rest of his/her case if the appellate courts

disagree with the trial judge? When, as here, the reviewing courts reweigh the evidence with nary a mention of the deferential manifest weight or clear error standards, there is a palpable sense of arbitrariness that will constrain Illinois litigants to make an *entire* record–even when the trial judge finds more hearings unnecessary." (Emphases in original.)

The precedent set by this court's refusal to allow completion of evidence on the intermediate scrutiny first amendment issues following the reversal of a directed finding undermines the integrity of the directed-verdict procedure, and strongly discourages Illinois litigants from employing this judicial time-saving device for fear of losing their rights to complete their record if their directed verdict is upset on appeal. The fact that this litigation has a protracted history should be of no moment in this consideration, and is not a reason to short-circuit our own well-settled laws of civil procedure.

As a final matter, Pooh Bah contends in its petition for rehearing that this court's opinion contains "errors, omissions and distortions of the record" which serve to inject "irrelevant," "misleading," and "consistently one-sided" information into this case. I agree with Pooh Bah that these points merit further consideration by this court.

First, at page 33 of the slip opinion, the court discusses the evidence presented by the City in the circuit court with respect to the historical negative secondary effects caused by strip clubs licensed to sell alcohol in the Rush Street area of Chicago during the late 1970s and early 1980s. Testimony in the circuit court indicated that during that time period, strippers and waitresses associated with those Rush Street establishments accounted for a large number of the prostitution arrests in that geographic area, and, this court states, "[n]egative secondary effects were serious and pervasive." This court then turns to the present state of affairs and observes that, with respect to Pooh Bah's club, "[s]uch widespread effects may not have recurred *yet*." (Emphasis added.) This court also notes in footnote 14 on the same page of the slip opinion that although the City in this litigation had initially alleged that incidents of prostitution occurred at Pooh Bah's club, "it does not appear that any dancer or patron has *yet* been charged with prostitution or prostitution-related offenses." (Emphasis added.)

The insertion of the word "yet" into these statements amounts to an unjustified judicial forecast that, even though the historic negative secondary effects associated with strip clubs selling alcohol have not been proven with respect to Pooh Bah's club, and, even though the City failed to establish that incidents of prostitution occurred at or could be connected to the club, they simply have not "yet" occurred and will likely appear in the future. This is particularly inappropriate in light of the litigation below where the City attempted to prove solicitation and/or prostitution and failed completely in establishing its case. In his memorandum opinion and order, the circuit court judge below–who had the opportunity to assess the demeanor and credibility of the witnesses who testified on behalf of the City–described the failings in the City's evidence as follows:

> "Undercover police officers *** tried to entrap the dancers in an attempt to show prostitution and solicitation. According to the clear evidence presented at the trial, the dancers were not interested. The police tried using video cameras planted in their neckties–James Bond style–to show violations. That failed too. The simplest thing that could have been done by the City would have been to produce residents who were affected by the existence of [the Club]. None were brought forth. At least five police officers, a minimum of five assistant corporation counsels and the latest in modern technology were used to present a case that was totally devoid of proof."

The circuit court judge further wrote that "the City did not produce any neighbors–either commercial or residential owners or tenants–who complained about the existence of or the effects of [the Club]. No Testimony was offered by the City that [the Club] operated in a manner which unreasonably interferes with the health, safety, peace, comfort of convenience of the general public."

Accordingly, the record affirmatively refutes the allegation of the City that there was solicitation and/or prostitution in–or associated with–Pooh Bah's club. It is blatantly improper for this court on review to intimate that it is only a matter of time before the historical negative secondary effects, including prostitution, occur–despite the fact that the record in this case is completely devoid of such evidence. This court unjustly places its imprimatur in a published opinion on the

suggestion that Pooh Bah's club has in the past and/or will in the future be connected to these types of illegal and undesirable activities.

In addition, Pooh Bah also states in its petition for rehearing that this court has selectively reached outside the record to inject "facts" into its opinion which are not only "irrelevant, defamatory and consistently one-sided," but also which occurred *subsequent* to the proceedings in the circuit court below, in an effort to support its ruling in favor of the City and against Pooh Bah. According to Pooh Bah's rehearing petition:

> "[T]he Court has expended extraordinary *sua sponte* effort to inject irrelevant and tertiary references to other's criminal conduct and associations, as well as baseless accusations of 'prostitution' to taint the Club and its ownership. This is not only completely unnecessary to the decision in this case, but misrepresents the facts and relationships involved. It is also unfair. Pooh Bah has no opportunity here or on remand (under the current order) to present rebuttal evidence. *** Such guilt by association has no place in a judicial opinion."

I agree.

In its rehearing petition, Pooh Bah points to the information contained within footnotes 2 and 3 of this court's opinion as being particularly egregious. Both of these footnotes contain outside-the-record information which is blatantly unfair to defendants and irrelevant to this court's decision. For example, footnote 2 maligns Joe Pascente–one of four assistant managers at the Club–as the son of a convicted defrauder, and impliedly paints him with that same brush. As far as this record reflects, Joe Pascente has not been convicted of any crime, and is not "associated" with any other criminals. In addition, the statement in the footnote that the Chicago police department "fired [him] for failing to disclose that he was a subject of an FBI investigation into insurance fraud involving his father" is improper. The record below reflects that Joe Pascente denied that he was ever a subject of an FBI investigation, there is no judicial finding on this issue, and there is no evidence in this record–nor any cited in the challenged footnotes–to confirm that he was such a subject. The City's police personnel file (on which the City attorney said that she based her accusation during the hearings in the circuit court) is not contained in this record. Nevertheless, this court's footnote treats that

hearsay allegation as a fact in a published opinion, with respect to a person who has not been convicted of any wrongdoing. This is improper and sets a disturbing precedent.

In addition, with respect to Joe's father, Fred Pascente, the record reflects that he was a retired Chicago police detective who was an employee of the Club, but had no management authority. Footnote 2, however, insinuates that Fred Pascente was running the Club, and that there is an association between the Club and nefarious criminals because Fred Pascente is *now* listed in the Nevada Gaming Commission's "Black Book." I note that this listing occurred *subsequent* to the conclusion of the protracted litigation below, and that this information was drawn by this court from sources outside the record on appeal.

Similar concerns exist with respect to footnote 3 in the opinion. In this footnote, the court has provided a detailed resume of the legal problems faced by Fred Rizzolo which apparently have occurred *subsequent* to his involvement with the Club, and which have been gleaned, once again, from sources outside the record on appeal. The record in this case reflects that in 1995 the Club's owner, Perry Mandera, entered into management and licensing agreements with Rizzolo, who owned a Las Vegas strip club known as the "Crazy Horse Too." Mandera stated that he wanted to license the nationally recognized "Crazy Horse Too" name for his Chicago Club because it would be a name known to Chicago conventioneers and, therefore, work as a benefit to the business. As this court's opinion notes, the Club operated under the "Crazy Horse Too" name until 2003. Footnote 3 of the court's opinion, however, focuses on Rizzolo's legal difficulties in 2006 with respect to the operation of his Las Vegas club, with no indication that any difficulties arose with respect to his association with Mandera's Chicago Club, or that this played any part in the proceedings below. Because the City did not allege criminal infiltration of Pooh Bah's business, Pooh Bah had no reason to rebut such claimed associations in the circuit court below, as they were first emphasized in this opinion on appeal.

As a court of review, it is our role to examine the record below and review the validity of the judgments below. It is not our role to *supplement* the record on appeal. Will litigants now expect that in every case this court will comb the Internet or other outside-the-

record sources of information–whether reliable or not–to gather up-to-the-minute information irrelevant to the disposition of the legal issues in their case on appeal, but prurient enough to include as tantalizing side-pieces of information contained within the footnotes of this court's opinions? After the opinion filed in the matter at bar, they would be justified in so believing.

It is unclear to me why, at the very least, this particular portion of Pooh Bah's petition for rehearing has not generated any type of response from my colleagues in the majority. Do they not agree that such errors, omissions and distortions of the record in this case warrant a correction?

Because I am troubled by the points raised by Pooh Bah in its petition for rehearing, I believe that this matter merits further reflection by this court on rehearing. Accordingly, I respectfully dissent from the denial of rehearing in this cause.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| CITY OF CHICAGO, an Illinois municipal corporation, | ) | |
| | ) | |
| Plaintiff-Counterdefendant, | ) | |
| | ) | No. 99 CH 9682 |
| v. | ) | |
| | ) | |
| POOH BAH ENTERPRISES, INC., an Illinois corporation, and PERRY MANDERA, | ) | |
| | ) | |
| Defendants-Counterplaintiffs. | ) | |

| | | |
|---|---|---|
| POOH BAH ENTERPRISES, INC., an Illinois corporation; ACE ENTERTAINMENT CO., INC., an Illinois corporation; PERRY MANDERA, Pooh Bah president and Ace Entertainment Co., Inc. president; LISA D. SIMS, CHRISTEN E. HADSALL, and SUSAN L. LJENQUIST, entertainers and dancers; and PETER ABRUZZO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 93 CH 4559 |
| | ) | |
| CITY OF CHICAGO, an Illinois municipal corporation; RICHARD M. DALEY, in his official capacity as Mayor of the City of Chicago; WINSTON MARDIS, in his official capacity as Director of the Mayor's License Commission; LICENSE APPEAL COMMISSION; WILLIAM D. O'DONAGHUE, Chairman; ALBERT D. MCCOY and IRVING J. KOPPEL, Commissioners, | ) | |
| | ) | |
| Defendants. | ) | |

PARTIAL JUDGMENT ORDER[1]

These cases are before the court on Pooh Bah's motions for directed findings and for judgment at the conclusion of the City's case-in-chief on the City's Counts I-V in No. 99 CH 9682 and on Pooh Bah's Counts VI and VII in No. 93 CH 4559, and on the parties' stipulation submitting the cases for a ruling on the current record, along with the record on administrative review, subject

---

[1] In this order, "City" refers to plaintiff in No. 99 CH 9682 and, collectively, to defendants in No. 93 CH 4559; and "Pooh Bah" refers, collectively, to defendants in No. 99 CH 9682 and to plaintiffs in No. 93 CH 4559.

to reservations by all parties of their respective rights to present additional evidence if these motions are not finally dispositive; and the court, being fully advised in the premises, does now FIND:

1. The City has rested on its following claims and defenses, which are ripe for a ruling on Pooh Bah's motions for directed findings and for judgment:

   (a) Counts I-III of its complaint in No. 99 CH 9682 (seeking injunctive relief);

   (b) the liability issues in Counts IV and V of its complaint in No. 99 CH 9682 (seeking fines); and

   (c) its defense against Pooh Bah's facial constitutional attack on § 4-60-140(d) of the Chicago Municipal Code;

2. The court reaffirms the rulings set forth in its Memorandum Opinion and Order issued January 18, 2001 ("January 18th Memorandum Opinion") and in the transcript of proceedings in this case dated August 21, 2000 ("August 21st Rulings"); and

3. Appellate review of this court's decision, as set forth in the January 18th Memorandum Opinion and the August 21st Rulings, will expedite the ultimate resolution of this matter and conserve judicial resources;

WHEREFORE, IT IS HEREBY ORDERED:

1. For the reasons stated in the January 18th Memorandum Opinion and the August 21st Rulings, Pooh Bah's motions for directed findings and for judgment are granted, and therefore:

   (a) in case No. 99 CH 9682, judgment is entered for Pooh Bah and against the City on Counts I-V of the complaint; and

   (b) in case No. 93 CH 4559, judgment is entered for Pooh Bah and against the City on Counts VI and VII, and the order of the Chicago License Appeal Commission in No. 93 LA 11, affirming the order of revocation entered by the Mayor's License Commission in No. 93 LR 32, is reversed; charges 1-22 in No. 93 LR 32 are dismissed; and the revocation of Pooh Bah's City licenses is vacated and set aside;

2. The January 18th Memorandum Opinion and the August 21st Rulings are incorporated into and made a part of this order;

3. The court retains jurisdiction:

-2-

(a)  in No. 99 CH 9682, over Pooh Bah's pending amended counterclaims and the City's affirmative defenses thereto;

(b)  in No. 93 CH 4559, over Pooh Bah's remaining claims and the City's affirmative defenses thereto;

(c)  over the remaining trial of these matters, if any of the judgments herein shall be reversed or vacated, for which purpose:

(i)  the City has reserved its right to present additional evidence on the amount of the fines to be assessed on Counts IV and V in 99 CH 9682; and

(ii)  Pooh Bah has reserved its right to present additional evidence in opposition to Counts I-V and in support of its affirmative defenses and amended counterclaims in No. 99 CH 9682, and in support of its claims in No. 93 CH 4559, if the judgments in this order are not affirmed in a final and non-appealable order;

4.  All proceedings in these two cases shall be stayed pending a final order on the appeal from this order;

5.  There is no just reason for delaying enforcement or appeal of the judgments in this order; and

6.  This order shall be entered in both No. 99 CH 9682 and No. 93 CH 4559.

ENTERED

ENTER:

MAY 01 ~~~

Judge  AARON JAFFE, 190_

AGREED:

David A. Epstein
David A. Epstein, Ltd.
30 N. LaSalle St., Ste. 3400
Chicago, Illinois 60602

Robert J. Weber
Law Offices of Robert J. Weber
30 N. LaSalle St., Ste. 2800
Chicago, Illinois 60602
Attorneys for the Pooh Bah parties

Diane M. Pezanoski
Patricia M. Moser
City of Chicago Law Department
30 N. LaSalle St., Ste. 900
Chicago, Illinois 60602
Attorneys for the City parties

DATED: April ___, 2001.

-3-